No. 26-2403

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

MAURISA GAY,
PERSONAL REPRESENTATIVE OF
ESTATE OF ANTHONY GAY

*Plaintiff-Appellant*,

*v.*

LATOYA HUGHES, et al.,

*Defendants-Appellees*.

---

Appeal from the United States District Court
for the Central District of Illinois
Case No. 19-cv-01133
The Honorable Judge Sue E. Myerscough

---

# OPENING BRIEF AND REQUIRED SHORT APPENDIX OF PLAINTIFF-APPELLANT MAURISA GAY, PERSONAL REPRESENTATIVE OF ESTATE OF ANTHONY GAY

---


Locke Bowman
Maggie Filler
Loevy & Loevy
311 N. Aberdeen Street, 3d Floor
Chicago, IL 60607
312-243-5900
maggie@loevy.com

Stephen Weil
Romanucci & Blandin, LLC
321 North Clark St., Suite 900
Chicago, IL 60654
(312) 458-1000
sweil@rblaw.net

## DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, counsel for Plaintiff-Appellant states as follows:

1. The full name of every party that the undersigned attorneys represented in this case is: Anthony Gay, and Maurisa Gay, as personal representative of the Estate of Anthony Gay.

2. The names of all law firms whose partners or associates have appeared for the Plaintiff-Appellant in the district court or are expected to appear for the Plaintiff-Appellant in this Court are:

- Loevy & Loevy
- Romanucci & Blandin LLC
- Roderick and Solange MacArthur Justice Center
- Weil & Chardon

3. The parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by the attorneys: N/A.

RESPECTFULLY SUBMITTED,

*/s/ Maggie Filler*

*One of Plaintiff-Appellant's Attorneys*

Locke Bowman
Maggie Filler
LOEVY & LOEVY
311 North Aberdeen Street, 3d Floor
Chicago, IL 60607
p. (312) 243-5900
e. maggie@loevy.com

Attorneys for Plaintiff-Appellant
Maurisa Gay

## DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, counsel for Plaintiff-Appellant states as follows:

1. The full name of every party that the undersigned attorneys represented in this case is: Anthony Gay, and Maurisa Gay, as personal representative of the Estate of Anthony Gay.

2. The names of all law firms whose partners or associates have appeared for the Plaintiff-Appellant in the district court or are expected to appear for the Plaintiff-Appellant in this Court are:

- Loevy & Loevy
- Romanucci & Blandin LLC
- Roderick and Solange MacArthur Justice Center
- Weil & Chardon

3. The parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by the attorneys: N/A.

RESPECTFULLY SUBMITTED,

*/s/ Stephen Weil*____________

*One of Plaintiff-Appellant's Attorneys*

Stephen Weil
ROMANUCCI & BLANDIN, LLC
321 North Clark St., Suite 900
Chicago, IL 60654
p. (312) 458-1000
e. sweil@rblaw.net

Attorney for Plaintiff-Appellant
Maurisa Gay

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

JURISDICTIONAL STATEMENT ........ 1

ISSUES PRESENTED FOR REVIEW ........ 2

STATEMENT OF THE CASE ........ 3

STANDARD OF REVIEW ........ 17

SUMMARY OF ARGUMENT ........ 17

ARGUMENT ........ 19

I. The State violated the Americans with Disabilities Act and the Rehabilitation Act by refusing to accommodate Gay's mental health disability in its prison discipline program. ........ 20

A. Gay's serious mental illness and chronic self-harm rendered him disabled within the meaning of the ADA and RA. ........ 21

B. Gay met essential eligibility requirements for the prison discipline program, rehabilitation programs, and congregate activities. ........ 22

C. The State's refusal to accommodate Gay's mental health disability in its prison discipline program was discriminatory. ........ 26

II. The State discriminated against Gay by refusing to make available inpatient hospitalization for his mental health disabilities. ........ 36

A. Gay's inpatient designation and additional evidence of his serious psychiatric needs demonstrates that Gay had a disability and was qualified to receive inpatient psychiatric services. ........ 37

B. The State's failure to make inpatient hospitalization services for Gay's mental health disability available, despite providing inpatient hospitalization for prisoners with physical ailments, was discriminatory. ........ 39

C. The District Court erred by ruling that Plaintiff's claim of discriminatory denial of access to medical services was a medical malpractice claim. ........ 42

CONCLUSION ........ 44

SHORT APPENDIX ........ 47

## TABLE OF AUTHORITIES

### CASES

*Alexander v. Choate*,
469 U.S. 287 (1985) .......... 35

*Amundson v. Wisconsin Department of Health Services,*
721 F.3d 871 (7th Cir. 2013) .......... 41

*Andrews v. Rauner*,
No. 18-cv-1101, 2018 WL 3748401, (C.D. Ill. Aug. 6, 2018) .......... 40

*Brown v. Meisner*,
81 F.4th 706 (7th Cir. 2023) .......... 42

*Bryant v. Madigan,*
84 F.3d 246 (7th Cir. 1996) .......... 42

*Bultemeyer v. Fort Wayne Community Schools*,
100 F.3d 1281 (7th Cir. 1996) .......... 21

*CTL ex rel. Trebatoski v. Ashland Sch. Dist.*,
743 F.3d 524 (7th Cir. 2014) .......... 19

*Dadian v. Village of Wilmette*,
269 F.3d 831 (7th Cir. 2001) .......... 35

*E.E.O.C. v. CNA Ins. Cos.,*
96 F.3d 1039 (7th Cir. 1996) .......... 41

*Finley v. Huss,*
102 F.4th 789 (6th Cir. 2024) .......... 31

*Fultz v. Taylor*,
No. 19-cv-557, 2023 WL 2328212 (N.D. Ind. Mar. 1, 2023) .......... 34

*G.H. by and through Henry v. Marstiller*,
424 F. Supp. 3d 1009 (N.D. Fla. 2019) .......... 31, 35

*Hammond v. Pennsylvania Dep't of Corrs.*,
No. 25-cv-00048, 2026 WL 2279774 (M.D. Pa. Aug. 6, 2026) .......... 34

*Hansen v. Fincantieri Marine Grp.*,
763 F.3d 832 (7th Cir. 2014) .......... 17

*Iwata v. Intel Corp.*,
349 F. Supp. 2d 135 (D. Mass. 2004) .......... 42

*Jaros v. Illinois Dep't of Corrections*,
684 F.3d 667(7th Cir. 2012) .......... 20

*Kiman v. New Hampshire Dep't of Corrs.,*
451 F.3d 274 (1st Cir. 2006) .......... 43, 44

*Kucinsky v. Jeffreys*,
2026 WL 1784683 (S.D. Ill. June 22, 2026) .......... 32

*Larson v. Dep't of Human Svcs.*,
23-cv-1823, 2024 WL 4485572 (D. Minn. May 16, 2024) .......... 34

*Latson v. Clarke*,
249 F. Supp. 3d 838 (W.D. Va. 2017) .......... 31

*Lewis v. Aetna Life Ins.*,
982 F. Supp. 1158 (E.D. Va. 1997) .......... 41

*Matter of Ingersoll*,
188 Ill. App. 3d 364 (1989) .......... 38

*McDaniel v. Syed*,
115 F.4th 805 (7th Cir. 2024) .......... 17, 19, 26, 35

*O'Guinn v. Nevada Department of Corrections*,
468 Fed. Appx. 651 (9th Cir. 2012) .......... 25

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999) .......... 32, 42

*Paine v. Johnson*,
No. 06-cv-3173, 2010 WL 785397 (N.D. Ill. 2010) .......... 43

*Pennsylvania Dep't of Corrs. v. Yeskey*,
524 U.S. 206 (1998) .......... 27, 40

*Pesce v. Coppinger*,
355 F. Supp. 3d 35 (D. Mass. 2018) .......... 43

*Peters v. Baldwin Union Free Sch. Dist.*,
320 F.3d 164 (2d Cir. 2003) .......... 21

*Ponsetti v. GE Pension Plan*,
614 F.3d 684 (7th Cir. 2010) .......... 17

*Randolph v. Rodgers*,
170 F.3d 850 (8th Cir. 1999) .......... 27

*Rasho v. Walker*
No. 7-cv-1298 (C.D. Ill. Jan. 21, 2016) .......... 12

*Reaves v. Dep't of Corrs.*,
195 F. Supp. 3d 383 (D. Mass. 2016) .......... 28

*Saylor v. Nebraska*,
20-cv-264, 2021 WL 2593449 (D. Neb. June 24, 2021) .......... 31

*Shaw v. Kemper*,
52 F.4th 331 (7th Cir. 2022) .......... 27

*U.S. v. Georgia*,
546 U.S. 151 (2006) .......... 39

*Valencia v. City of Springfield, Ill.*,
883 F.3d 959 (7th Cir. 2018) .......... 29

*Walker v. Mintzes*,
771 F.2d 920 (6th Cir. 1985) .......... 29

*Wallace v. Jeffreys*,
No. 17-cv-576, 2023 WL 2138337 (S.D. Ill. Feb. 21, 2023) .......... 25, 34

*Washington v. Indiana High School Athletic Ass'n*,
181 F.3d 840 (7th Cir. 1999) .......... 22, 23

*Williams v. Secretary of the Pennsylvania Department of Corrections*,
117 F.4th 503 (3d Cir. 2024) .......... 33

*Wis. Cmty. Servs., Inc. v. City of Milwaukee*,
465 F.3d 737 (7th Cir. 2006) .......... 19, 29

*Women Prisoners of the D.C. Dep't of Corrs. v. District of Columbia*,
93 F.3d 910 (D.C. Cir. 1996) .......... 24

**STATUTES**

29 U.S.C. § 794 .......... passim

42 U.S.C. § 12102 .......... 21

42 U.S.C. § 12132 .......... 15, 19, 22, 40

## OTHER AUTHORITIES

28 C.F.R. Pt. 35 .......... 27, 29

28 C.F.R. § 35.130(d) .......... 32

## RULES

Federal Rule of Civil Procedure 56 .......... 17

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction pursuant to 28 U.S.C. § 1331. The Constitutional provisions and federal statutes that gave rise to federal question jurisdiction in the district court are the Eighth and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. On September 4, 2025, the district court granted summary judgment to Defendant Latoya Hughes in her official capacity for the State of Illinois ("State") on all claims against the State. After resolution of claims against the remaining defendants, the district court entered final judgment on July 1, 2026. On July 2, 2026, Plaintiff-Appellant Maurisa Gay timely filed a notice of appeal.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

I. Whether genuine disputes of material fact preclude summary judgment on Plaintiff's claim that the State of Illinois violated the Americans with Disabilities Act and the Rehabilitation Act by failing to make reasonable accommodations for Plaintiff's decedent, who was a mentally disabled prisoner and, as a result of the State's failure to accommodate, spent twenty-two years in solitary confinement for conduct linked to his mental health disability, and suffered particular harm?

II. Whether genuine disputes of material fact preclude summary judgment on Plaintiff's claim that the State violated the Americans with Disabilities Act and the Rehabilitation Act by refusing to provide inpatient hospital services to Plaintiff's decedent, who was a mentally disabled prisoner whose mental illness required inpatient psychiatric hospitalization, while the State extended inpatient hospital services to prisoners with physical disabilities for treatment of their physical ailments?

## STATEMENT OF THE CASE

In December 1994, Anthony Gay entered the Illinois Department of Corrections ("IDOC") on a seven-year sentence. R.292-6[1] at 22; R.301-16 at 5-6 (¶¶ 19, 21). He was 21 years old. R.292-2 at 2 (4:16).

The IDOC has a disciplinary code with rules prohibiting prisoner conduct such as disobeying orders, possessing contraband, assault, and other misconduct. R.292-14. Prisoners who break these rules are subject to a range of sanctions, including assignment to solitary confinement, or "segregation," for a defined term. R.292-14; R.292-15 at 1-2.

In 1996, Gay broke a prison rule and went to solitary confinement. R.292-19 at 3. Pursuant to the discipline program, Gay was to remain in solitary confinement for this rule violation until the end of his solitary term, or earlier with good behavior. R.301-12 at 131-32 (130:1-131:19).

Unfortunately, Gay had a disabling mental illness. R.301-15 at 58-59. His mental health disability caused him to suffer greatly in solitary confinement. R.301-15 at 60-61. His suffering, in turn, caused him to engage in self-harm and irrational behavior that violated prison rules. R.301-15 at 49-50. Gay accrued additional rule

[1] References to the district court record are cited as "R.," followed by docket and page number. References to the short appendix are abbreviated "App.," followed by page number. Page number citations are to the PageID# in the ECF header, and deposition transcripts also include the court reporter's line and page numbers in parentheses.

violations before he could finish his solitary term, and IDOC extended his solitary confinement. R.292-19 at 3-4; *see also* R.292-18.

Gay's behavior in isolation was an effect of his mental illness that he could not control. R.301-15 at 49-50. The record contains both evidence of his self-harming behavior and his inability to conform to prison rules while in isolation. R.292-32; R.301-15 at 49-50. The State failed to make accommodations for Gay's mental illness, and as a result he spent 22 years in solitary confinement.

**Gay's Mental Illness**

Gay's mental illness was serious and disabling. R.300-4 at 7 (24:7-9); R.300-18 at 107 (106:6-21); R.301-15 at 58-59.

Mental health providers designated Gay as Seriously Mentally Ill ("SMI"). R.292-9 at 6; R.300-25 at 2. SMI is a formal category used by IDOC, and it requires either a diagnosis or significant signs and symptoms of a mental disorder, plus impaired emotional, cognitive, or behavioral functioning. R.292-26 at 65.[2] IDOC forced antipsychotic medication on Gay due to the severity of his mental illness, as he was at substantial risk of serious harm to himself. R.301-2 at 2; *see also* R.292-35 at 10-12.

---

[2] Gay consistently scored 18-21 on the Modified Global Assessment of Functioning ("MGAF") scale, indicating severe impairment due to self-mutilation. R.292-35 at 13, 23, 25, 35, 37, 38, 48; R.300-25 at 2. On one occasion, the record reflects an MGAF of 38-40, but this was a typographical error. *Compare* R.292-35 at 19 *with* 23.

IDOC providers diagnosed Gay with mental health disorders including borderline personality disorder, impulse control disorder, mood disorder, depressive disorder, post-traumatic stress disorder, bipolar disorder, and anxiety disorder. R.301-3 at 2; R.300-1 at 9 (31:8-15). Borderline personality disorder caused him "[c]hronic emptiness . . . feelings of rejection [and] abandonment." R.292-2 at 17-18 (64:5-65:7).[3]

**Gay's Isolation**

In disciplinary solitary confinement, Gay lived in a windowless cell, behind a solid steel door. R.292-2 at 18 (66:5-12), 43-44 (166:13-20, 169:6-8). Standing in the middle of the cell, Gay could touch the walls on either side. R.292-2 at 42 (164:13-16). He was locked into his cell 22 to 24 hours a day. R.292-2 at 42 (164:20-22).

Prisoners in solitary confinement have restricted movement and lose access to a variety of congregate programs, including congregate meals, group recreation, communal religious services, rehabilitative programming, and prison jobs. R.292-2 at 94-95 (371:20-372:1, 373:13-374:1); R.292-16 at 10 (33:5-35:17), 13-14 (45:6-50:23); R.301-15 at 11-12.

In isolation, Gay could not access general population programs and activities. He could not go to the prison's church to participate in communal religious services. R.292-2 at 94-95 (372:15-374:23). He could not have a job assignment. R.292-16 at 13

[3] Borderline Personality Disorder is titled a personality disorder, but it is "quite different than other personality disorders, can involve psychotic and suicidal features, and qualifies as a serious mental illness to the extent symptoms are severe and disability significant." R.301-15 at 5 (¶ 5).

(47:11-48:1). He could not participate in vocational programming. R.292-16 at 14 (49:7-15). He could not participate in educational programs like college classes. R.292-16 at 14 (49:16-50:4). In general, his time out-of-cell was restricted so that he could not go to places like the prison yard, and he could not access programming off the unit. R.292-15 at 2-3; R.292-16 at 9-10 (32:19-36:17).

**The Effect of Isolation on Gay's Mental Illness**

Isolation exacerbated Gay's mental illness and caused him to deteriorate. R.300-1 at 11 (37:4-18). Gay testified that "solitary confinement drove [him] nuts." R.292-2 at 13 (48:11). He felt "trapped," "like the walls [were] closing in." R.292-2 at 18 (67:9-15). Gay described the environment as "psychologically darker than the inside of [a] cow," and told his providers he was "psychologically drowning." R.292-32 at 12-13. Gay's deterioration manifested in extreme self-harm and irrational, rule-breaking behaviors that prevented him from completing IDOC's disciplinary program and leaving isolation. R.301-15 at 48-50.

Dr. Terry Kupers, Plaintiff's expert, explained that "[f]or prisoners . . . who suffer from serious mental illness . . . the isolation and idleness [of solitary confinement] exacerbate the psychiatric disorder[.]" R.301-15 at 21. Gay was part of a "relatively rare subgroup of prisoners" who, due to mental illness, are unable to maintain the kinds of behaviors that allow them to advance out of solitary. R.301-15 at 48-50. Because of Gay's mental illness, he "could not function in solitary confinement." R.301-15 at 49. Thus, Gay engaged in self-mutilation and irrational,

rule-breaking behavior such as throwing water and bodily fluids at officers while he was isolated. R.301-15 at 48; R.292-18.

The primary manifestation of Gay's decline in solitary was self-harm. R.301-15 at 61. Self-harm provided "relief" when "isolation was eating at [him]." R.292-2 at 45 (174:19-175:10). It brought Gay the human contact he craved. R.292-2 at 45 (176:4-7). Gay was unable to stop himself from self-harm. R.292-2 at 19 (71:18-20). Gay's providers testified that his self-harm was "extreme." R.300-24 at 17 (61:17-21).

According to Dr. Kupers, "Gay's particular psychiatric qualities and disabilities ma[de] it extremely traumatic for him to be in solitary confinement," and he experienced "severe anxiety, agitation, boredom and a sense of being dead" when isolated. R.301-15 at 6 (¶ 9). Gay cut or mutilated himself when those feelings were "too painful to tolerate." R.301-15 at 6 (¶ 9). Gay focused his self-mutilation on his eyes and scrotum, because he believed they were the most sensitive areas in terms of pain. R.301-15 at 43. In reviewing Gay's self-harm history in IDOC, which included "cutting off his own testicle, sewing cloth to his skin, packing wounds with chicken bones, pens, and other objects, and . . . bleeding half his blood volume out," one of Gay's mental health providers described the self-harm as "border[ing] on the psychotic" and comparable to "addiction." R.300-6 at 7.

Gay cut himself over 1,000 times between 1998 and 2018. R.292-2 at 13 (45:15-20). The summary judgment record chronicles some of Gay's self-harm history. R.292-32.

Gay sliced open his scrotum and inserted nine staples and a zipper. R.292-32 at 3. Gay was hospitalized due to testicle laceration and laceration of his right thigh. R.292-32 at 4. An officer told treaters at the hospital: "He does stuff like this all the time." R.292-32 at 4. Gay made a three-inch laceration on his body that required six sutures. R.292-32 at 6. He reported that "pain is a necessity," and described cutting as releasing stress. R.292-32 at 6. Gay sewed a sheet into his inner thigh, removed a bandage on his arm, and cut his scrotum. R.292-32 at 7-8. He reported not wanting to hurt himself but feeling trapped. R.292-32 at 9. He told providers, "I don't wanna bug up, but I get agitated in this small space." R.292-32 at 9.

Gay cut his arm and legs, and he inserted foreign objects into his body. R.292-32 at 14. He was hospitalized with two spoons and a pen in his scrotum. R.292-32 at 19. On another occasion, he jammed nails in his scrotum. R.292-32 at 20. Staff observed Gay laying in front of the door of his cell under a blanket, while blood seeped under the door. R.292-32 at 19. At one point, Gay cut open his scrotum, pulled out his testicles, and held them in his hands. R.300-8 at 8 (27:2-8). Gay inserted pen parts into his ear and lacerated his thigh. R.292-32 at 25. Another time, Gay put a spork in his leg. R.292-32 at 32.

Dr. Kelly Renzi, one of Gay's mental health providers, recalled him sewing parts of a fan motor into his scrotum and stabbing a pen near his eye. R.300-26 at 27-28 (104:13-105:1). Mental health providers told Gay that they could not do anything

about his disciplinary segregation, because it was up to the "administration." R.292-2 at 57 (223:15-224:10).

### The State's Response to Gay's Mental Illness

Gay's mental illness and solitary confinement caused him to behave in ways that violated prison rules. R.301-15 at 48. IDOC responded by imposing new, consecutive sanctions of additional time in solitary. R.301-16 at 7 (¶ 27). The time in solitary exacerbated Gay's mental illness, causing Gay to commit new rules violations, leading to a vicious cycle of more misconduct, additional time in solitary, and further inappropriate behavior. R.301-15 at 48-49.

Whereas other prisoners could "earn" their way out of disciplinary solitary confinement by "pro-social behavior," Gay was "doomed to perpetual solitary confinement" because of his mental health disability. R.301-15 at 48-49.

Gay received years of disciplinary solitary confinement terms for conduct tied to self-harm. R.301-16 at 7 (¶ 27). An IDOC mental health provider who reviewed Gay's disciplinary history found multiple rule violations related to self-harm and suicidality. R.300-18 at 112-14 (111:12-113:4); R.301-17 at 38 (¶ 57). Gay testified that he received "a lot" of discipline for self-harm. R.292-2 at 23 (87:3-4). He received a total of six years of disciplinary solitary confinement for squirting, spitting, or throwing his blood at people. R.292-18 at 83, 101, 103, 125, 129, 130. He received a total of seven years and three months of disciplinary solitary confinement for having sharpened items, including pen pieces, caulk, staples, glasses, a toothbrush, a nail,

metal, chicken bones, and sporks. R.292-18 at 39, 41, 52, 60, 72, 88, 110, 119, 125, 126, 131-32. Reviewing these disciplinary infractions, Plaintiff's expert Dora Schriro, a former correctional administrator, observed that many were "re-characterizations of his repeated acts of self-harm." R.301-16 at 7 (¶ 27); *see also* R.301-15 at 10.

Gay's mental illness and isolation caused him to engage in irrational behavior such as throwing water, bodily fluids and liquids at officers, all of which broke prison rules. R.301-15 at 48-50. The State responded to these behaviors by extending his disciplinary segregation. R.292-18. Gay received an additional year of disciplinary solitary confinement for throwing a paper sheet at staff, R.292-18 at 99, a total of four years and nine months of solitary for throwing water, R.292-18 at 5, 8, 10, 12, 16, 18, 34, 72, and a total of twenty-six years and four months of solitary for assaults with unidentified liquids, R.292-18 at 5, 7, 12, 14, 18, 20-22, 26, 30-31, 33, 35, 42-45, 50, 52, 62, 64, 80-82, 92-93, 101, 108, 110. Schriro opined that there was "no penological gain" from continuing to isolate Gay in response to this misbehavior. R.301-16 at 17 (¶ 60); *see also* R.301-17 at 30 (¶ 41).

Prosecutors charged Gay with multiple cases of criminal assault for his behavior in solitary confinement.[4] Prosecutors structured the charges to obtain

[4] Gay was charged and found guilty of aggravated battery on an officer in the following cases out of Livingston County, Illinois: 2001-CF-195 (3 years), 2003-CF-62 (6 years), 2003-CF-60 (6 years), 2003-CF-146 (7 years), 2003-CF-61 (6 years), 2001-CF-75 (5 years), 2003-CF-172 (6 years), 2001-CF-76 (8 years), 2002-CF-22 (7 years), 2003-CF-269 (8 years), 2004-CF-24 (8 years), 2001-CF-234 (12 years), 2004-CF-13 (6 years), 2004-CF-63 (6 years), 2003-CF-299 (6 years). This Court may take judicial notice of these sentence dispositions pursuant to Federal Rule of Evidence 201, as they are adjudicative facts and publicly available via judici.com.

sentences that ran consecutively, such that by 2006, Gay had received 100 additional years onto his prison sentence.[5]

In the end, Gay accumulated 418 years of solitary—more than he could ever serve. R.301-21.

IDOC had options to accommodate Gay, but it did not use them. Per IDOC policy, an "adjustment committee" could recommend and the facility warden could approve reduction in disciplinary segregation time. R.292-16 at 34 (130:1-131:19). But the committee asked if a prisoner's "good behavior" in segregation justified early release. R.292-16 at 34 (130:1-131:19). As Dr. Kupers explains, requiring Gay to "exhibit pro-social behavior" to get out of solitary was "doomed to fail" because of Gay's disability. R.301-15 at 49. When Gay submitted a grievance asking prison administrators to reduce his disciplinary solitary term, IDOC denied it, saying that Gay had to request a reduction based on his conduct in segregation. R.292-65 at 3.

IDOC had policies that if effectively implemented should have prevented Gay's decades in solitary. R.301-16 at 8 (¶ 29). But insistence on "treating Mr. Gay as a disciplinary problem rather than a mental health one" frustrated the written policies so that they were not properly implemented. R.301-16 at 8 (¶ 30).

[5] *See* note 4, *supra*.

Eventually, the State entered into a settlement agreement in *Rasho v. Walker*, No. 7-cv-1298, Doc. 346-1 (C.D. Ill. Jan. 21, 2016),[6] that required accommodation of mental illness in the prison's use of disciplinary solitary confinement. R.292-16 at 30-31 (113:20-117:24). Gay did not immediately benefit. The State made a superficial reduction to Gay's disciplinary solitary term, resulting in a new segregation out-date of August 17, 2160. R.292-8 at 17. IDOC also completed three "long-term segregation reviews" for Gay, but each time IDOC retained Gay in segregation without explanation. R.292-8 at 5, 10, 12.[7]

Shortly before his release from prison in 2018,[8] IDOC relented and allowed Gay to live in an environment with fewer restrictions where he could participate in congregate activities and rehabilitative programs. R.300-2 at 58 (227:10-228:13), 59 (229:8-21), 66 (260:20-22). He moved to a general population area, where he was able to access the day room and had more movement out of his cell. R.300-2 at 65

---

[6] The *Rasho* case was brought by a class of mentally ill prisoners who alleged that the State failed to provide adequate mental health care and failed to accommodate their disabilities. *Rasho*, Doc. 346-1 at 1.

[7] The IDOC Cumulative Counseling Summary spans 2005 to 2018. R.292-8. It includes no reviews of Gay's long-term isolation until December 19, 2016. R.292-8 at 17. There are three "Long Term Segregation" reviews dated July 26, 2017, October 24, 2017, and February 1, 2018. R.292-8 at 12, 10, 5. The State's "Segregation/Mental Health/Due Process Review Summary" includes no information prior to 2016, and it summarizes the same segregation "reviews" that are listed in the Cumulative Counseling Summary. R.292-9.

[8] Gay received an out-date after his prison sentence was reduced. *See 22 Years in Solitary Confinement: Looking at the Life of Former Inmate Anthony Gay*, NPR ILLINOIS (January 11, 2019) [perma.cc/3VKG-5ADR] ("[S]tate prosecutors . . . were willing to negotiate with Anthony's criminal defense attorneys to reduce his sentence.").

(255:18-24), 66 (260:20-22). In this new environment, Gay's behavior improved. R.300-2 at 59 (229:22-230:6).

Prison administrators had previously assumed Gay would require civil confinement at the end of his prison sentence, but after a few months of reduced restrictions and access to activities like out-of-cell time, Gay improved to the point that civil confinement was unnecessary. R.300-2 at 59 (229:22-230:18).

**Gay Cannot Access Inpatient Mental Health Care**

During his years in solitary, Gay needed inpatient mental health care. R.301-3 at 2; R.301-20 at 11. IDOC recognized this fact. R.300-15 at 21 (80:11-16); R.300-26 at 19 (70:22-71:1); R.300-31 at 2; R.301-3 at 2; R.301-20 at 11.

IDOC used the term "inpatient" to describe the highest level of mental health care needs, for patients who "require a level of treatment that exceeds the level of care that [IDOC] is able to provide and results in commitment to outside facilities[.]" R.300-12 at 13; R.301-1 at 29. Gay was identified for "inpatient" care, because he needed "more intensive therapy and a therapeutic environment including hospitalization." R.301-3 at 2.

But, following a discriminatory policy, IDOC failed ever to allow Gay to access inpatient psychiatric care. R.301-17 at 48 (¶ 83). Instead, IDOC regularly placed Gay on crisis watch, a form of enhanced solitary confinement in which his property and movements were severely restricted. R.292-34 at 47 (175:9-176:24); R.300-17 at 14 (50:16-18); R.300-19 at 22-23 (84:10-86:6); R.300-26 at 34 (129:18-130:7); R.300-28 at

20-21 (76:1-79:9); R.301-3 at 6; R.301-15 at 47-48. Gay spent significant time on crisis watch—over 700 days. R.300-19 at 34 (130:19-132:24) & R.300-23. A psychiatrist who treated Gay while he was on crisis watch testified that Gay needed inpatient treatment in a psychiatric hospital, not crisis watch. R.300-19 at 27-28 (102:17-105:8).

By contrast, prisoners whose physical injuries and disabilities required in-patient care received it. R.161 at 32 (¶ 68); R.301-18 at 9.

The State knew it had to change its practices and provide inpatient care settings for its severely mentally ill prisoners. *See* R.301-13 (proposing, *inter alia*, a plan for immediate inpatient housing). The State provides inpatient mental health at psychiatric hospitals run by the Illinois Department of Human Services ("IDHS"), and it agreed to accept inpatient IDOC patients at its Chester Mental Health Center. R.310 at 11 (¶ 36), 17 (¶ 57); *see also* R.301-13 at 9-10. But no IDOC patients went to Chester for inpatient psychiatric services after the agreement. R.300-10 at 31 (31:2-14). The State was unable to explain why it referred just one IDOC patient to IDHS for inpatient mental health care and transferred none. R.300-10 at 31-33 (31:2-33:8), 94-95 (94:2-95:6).

**Proceedings Below**

Gay paroled from IDOC on August 27, 2018, and he filed this lawsuit on October 28, 2018. R.292-6 at 2; R.1. He brought official and individual capacity claims against the then-director of the IDOC, John Baldwin, and also sued the State of

Illinois, Wexford Health Sources, Inc., and a number of individual defendants. R.1. The District Court substituted Baldwin in his official capacity for the State of Illinois, because naming Baldwin in his official capacity was "no different from a suit against the State itself." R.44 at 10 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

On March 7, 2020, Gay filed the First Amended Complaint, which is the operative pleading in this case. R.82. Gay maintained his claims against the State via official capacity claims naming the current IDOC Director and maintained his claims against Wexford and the individual defendants. R.82. Gay alleged that his treatment by these Defendants violated the Eighth Amendment (Count I), the Americans with Disabilities Act, 42 U.S.C. § 12132 (ADA) (Count II), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (RA) (Count III), and the Fourteenth Amendment (Count IV). R.82.

On August 17, 2024, while this lawsuit was pending, Gay died of cancer. R.274, R.276 at 1. His daughter, Plaintiff-Appellant Maurisa Gay, continued this litigation as the representative of Gay's estate. 9/26/2024 Text Order.

On October 11, 2024, the State moved for summary judgment. R.285-1, R.288-1. As relevant to this Appeal, the State contended that summary judgment was warranted on Plaintiff's ADA and RA claims. R.288-1 at 41-43. The State argued that Gay was not otherwise qualified to participate in or receive the benefit of IDOC's services, programs, or activities, that there was no evidence in the summary judgment

record that the State denied Gay access to IDOC services, programs, or activities, and that there was no evidence that the State discriminated against Gay because of his mental health disability. R.288-1 at 41-43.

On September 4, 2025, the District Court granted the State's motion for summary judgment on Plaintiff's ADA and RA claims. App. at 1. The District Court found that Plaintiff failed to show discrimination against Gay based on his mental health disability. App. at 15. The District Court viewed Plaintiff's ADA/RA claim as arguing that Gay "was not given special consideration in the form of referral to an inpatient facility." App. at 15.

Plaintiff sought reconsideration of the District Court's Order, as Plaintiff articulated distinct grounds for relief under the ADA and RA: (1) failure to accommodate Gay's mental health disability in IDOC's disciplinary process, and (2) discrimination against mentally ill prisoners like Gay by failing to provide for off-site, inpatient psychiatric treatment. R.336. As to Plaintiff's first ground for relief, the District Court found that there was no evidence that IDOC refused to modify a rule, regulation, or policy that prevented Gay from participating in a prison program, service, or activity. App. at 25. The District Court also rejected Plaintiff's ADA and RA claims on the basis that they were "couched in terms of deficient or alternative mental health treatment," which the District Court viewed as "inapplicable under the ADA or RA." App. at 25. As to Plaintiff's second ground for relief, the District Court determined there was insufficient evidence on several points: (1) that Gay's mental

health providers designated him for inpatient care, (2) that IDOC was unable to treat Gay's mental health condition adequately, and (3) that IDOC refused to comply with an inpatient mental health referral. App. at 26. On these grounds, the District Court denied Plaintiff's reconsideration motion. App. at 26.

On July 1, 2026, the District Court issued judgment in the case. R.390. On July 2, 2026, Plaintiff filed a timely notice of appeal. R.391.

## STANDARD OF REVIEW

Summary judgment is appropriate only when the record shows "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010). All evidentiary conflicts are resolved, all facts are construed, and all reasonable inferences are drawn in favor of the non-moving party. *McDaniel v. Syed*, 115 F.4th 805, 821-22 (7th Cir. 2024); *Hansen v. Fincantieri Marine Grp.*, 763 F.3d 832, 836 (7th Cir. 2014) (at the summary judgment stage, non-movant is entitled to every reasonable inference).

Review of the district court's grant of summary judgment is *de novo*. *McDaniel*, 115 F.4th at 821.

## SUMMARY OF ARGUMENT

The State of Illinois violated the rights of Anthony Gay, who was disabled by mental illness, under the Americans with Disabilities Act and the Rehabilitation Act, by failing to modify its disciplinary program to accommodate Gay's inability to

conform his conduct to the disciplinary code while housed in solitary confinement. The effect of the State's failure to accommodate Gay's disability was to deprive Gay of access to programs and activities that are routinely available to mentally able prisoners within the Illinois Department of Corrections, including congregate recreation and rehabilitative programming. The consequences to Gay of the State's failure to accommodate his disability were horrific. Gay remained in solitary confinement for 22 years, a torturous existence that drove him to grotesque acts of self-mutilation. The State's failure to accommodate Gay's disability also led to a vicious cycle whereby the lack of accommodation caused Gay to violate prison rules, leading to additional time in solitary, which, in turn, generated more violations and more solitary time.

The State of Illinois also violated Gay's rights under the Americans with Disabilities Act and the Rehabilitation Act during his solitary confinement by failing to provide Gay access to inpatient mental health care in an outside hospital. The State failed to provide Gay this access due to a discriminatory practice whereby prisoners with physical injuries and impairments could receive inpatient care for their needs, but mentally disabled prisoners who needed inpatient mental health care could not. Without access to inpatient mental health treatment, when Gay suffered acute exacerbations of his mental illness, he spent extended periods on crisis watch, where he was further isolated.

This Court should vacate the grant of summary judgment and allow Plaintiff to

prove her claims at trial.

## ARGUMENT

The State of Illinois violated Gay's rights under two federal disability laws, Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794(a). Pursuant to the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The RA provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

Courts reviewing ADA and RA claims apply the same analysis when construing these statutory protections, and the relief is coextensive. *McDaniel*, 115 F.4th at 822 (citations omitted).

Plaintiff can make out a disability discrimination claim by showing that "the defendant intentionally acted on the basis of . . . disability," that "the defendant's rule disproportionally impacts disabled people," or that "the defendant refused to provide a reasonable modification." *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528–29 (7th Cir. 2014) (quoting *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006)).

The State violated Gay's rights under the disability statutes in two ways. *First,* the State failed to accommodate Gay's mental disability by modifying its disciplinary program, thereby depriving Gay of access to various prison programs and activities he should have been able to access. *See* Section I, *infra.* The summary judgment record contained evidence that "(1) [Gay] [was] a qualified person (2) with a disability and (3) the Department of Corrections denied him access to a program or activity because of his disability." *McDaniel*, 115 F.4th at 822 (quoting *Jaros v. Illinois Dep't of Corrs.*, 684 F.3d 667, 672 (7th Cir. 2012)). "It is well established that '[r]efusing to make reasonable accommodations is tantamount to denying access.'" *Id.* at 823 (quoting *Jaros*, 684 F.3d at 672).

*Second,* the State discriminated against Gay because of his mental disability, denying him access to the off-site care that it afforded to prisoners in need of treatment for physical injuries and disabilities. *See* Section II, *infra.*

## I. The State violated the Americans with Disabilities Act and the Rehabilitation Act by refusing to accommodate Gay's mental health disability in its prison discipline program.

The State refused to modify its prison discipline program to accommodate Gay's mental health disability even though solitary confinement exacerbated Gay's mental health disability, caused him to engage in severe self-mutilation and other irrational behaviors, and made it impossible for Gay to work his way out of solitary confinement by exhibiting the pro-social, rule conforming behavior that the State required. The State could have modified its prison discipline practices to

accommodate Gay's mental health disability by relieving Gay of his disciplinary solitary confinement term, but it refused to do so. Plaintiff's ADA and RA claims should go to trial on this basis.

### A. Gay's serious mental illness and chronic self-harm rendered him disabled within the meaning of the ADA and RA.

Federal disability law recognizes mental as well as physical disabilities. 42 U.S.C. § 12102(1)(A). "Disability" means (A) "a physical or mental impairment that substantially limits one or more major life activities," (B) "a record of such impairment," or (C) "being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1); *see Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1284 (7th Cir. 1996) (plaintiff's "past and continuing battle with bipolar disorder and paranoid schizophrenia" meant he was disabled). The term "major life activities" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "A mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself." *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 168 (2d Cir. 2003).

In seeking summary judgment, the State did not contest that Gay's evidence establishes this element. R.288-1 at 42. Nor could it; Gay's multiple mental health diagnoses, his severe functional impairment characterized by chronic self-harm, his

SMI designation, and his providers' decision to forcibly medicate him, all show that Gay was disabled due to mental illness. R.292-9 at 6; R.300-25 at 2-3; R.301-2 at 2.

### B. Gay met essential eligibility requirements for the prison discipline program, rehabilitation programs, and congregate activities.

The summary judgment record also raised a triable question as to whether Gay was "qualified" to participate in and receive the benefits of the State's services, programs, and activities. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). This element requires showing that Gay met "essential eligibility requirements for the receipt of services or the participation in programs or activities," "with or without reasonable modifications." 42 U.S.C. § 12131(2).

The Seventh Circuit has explained that a person with a disability is "otherwise qualified if he is able to participate with the aid of reasonable accommodations," because "some exceptions ought to be made to general requirements to allow opportunities to individuals with disabilities." *Washington v. Indiana High School Athletic Ass'n*, 181 F.3d 840, 851 (7th Cir. 1999). Only if accommodating a person's disability requires a "fundamental and unreasonable change," will they be deemed not "qualified" for failing to meet essential eligibility requirements. *Id.* at 850.

#### 1. Gay was eligible for the services, programs, and activities at issue.

The services, programs, and activities at issue include the prison discipline program as well as congregate recreation, time out-of-cell, work opportunities,

communal meals, congregate religious services, and other rehabilitative programming such as vocational training and education.

Gay met the basic eligibility requirement for accessing IDOC services, programs, and activities, because he was a prisoner in State custody. He was serving a disciplinary solitary confinement term, and so was eligible for benefits including the potential for early release from solitary and a meaningful opportunity to return to general population. Additionally, the evidence that Gay did well when he was finally allowed back to general population with access to the dayroom and more time out-of-cell, indicates that Gay was "eligible" for and capable of participating in these activities. *See* R.300-2 at 59 (229:14-230:9), 65 (255:14-24).

#### 2. No fundamental alteration was required for Gay to participate in and receive the benefits of the services, programs, and activities at issue.

The State could accommodate Gay's disability without "fundamental and unreasonable change" to its prison discipline program. *Washington*, 181 F.3d at 850. Gay's positive adjustment following release from solitary confinement shows this to be true. R.300-2 at 59 (229:14-230:9).

Additionally, the State allowed prison administrators to reduce disciplinary solitary confinement terms. R.292-16 at 33-34 (127:9-130:13). The fact that the State allowed reductions in disciplinary solitary terms and that its administrators had latitude to make adjustments shows that reducing Gay's disciplinary solitary term did not require fundamental change. *Cf. Washington*, 181 F.3d at 852 (reasoning that it was

not a fundamental alteration to require high school athletic association to waive its eligibility rule to accommodate a student athlete with a learning disability, where the association had granted waivers to other athletes in the past).

Evidence of the State's conduct following the *Rasho v. Walker* settlement is also probative. Pursuant to the *Rasho* settlement, the State reviewed disciplinary solitary terms of prisoners with mental illness, including Gay, and it conducted several "long-term segregation" reviews. R.292-16 at 30-31 (113:20-117:24); R.292-8 at 5, 10, 12 & 17. The State modified Gay's disciplinary term as part of the *Rasho* review. R.292-8 at 17. Although in Gay's case these reviews made no practical change to his circumstances and he remained in solitary confinement, their existence further shows that modifying even lengthy terms of disciplinary solitary confinement did not require "fundamental" change.

Plaintiff's expert Dora Schriro opined that IDOC's application of its own policies should have led to accommodation of Gay's mental health disability in the prison discipline program and prevented his isolation, but those policies were not meaningfully followed in Gay's case. R.301-16 at 8 (¶¶ 29, 30). Proper application of a public entity's own policies is not a "fundamental" or "unreasonable change." *See Women Prisoners of the D.C. Dep't of Corrs. v. District of Columbia*, 93 F.3d 910, 931 (D.C. Cir. 1996) (requiring compliance with prison's own procedures does "not impose any new burdens on appellants; it simply requires appellants to observe their own policies and procedures in the running of their prisons").

Finally, Plaintiff's experts opined that keeping Gay in disciplinary solitary confinement was not required as a penological matter. R.301-16 at 17 (¶ 60); R.301-17 at 30 (¶ 41). This evidence suggests that modifying the discipline program to accommodate Gay's mental health disability would not have undermined the program's purpose. *See Washington*, 181 F.3d at 850 (a "fundamental and unreasonable change" to a rule is a change that is "at odds with the purposes behind the rule"); *see also Wolff v. McDonnell*, 418 U.S. 539, 563 (1974) (describing the goal of the prison disciplinary process as "to advance the rehabilitative goals of the institution").

### 3. The State's argument that Gay was not a "qualified" person with a disability relied on a misinterpretation of Plaintiff's claim.

The State's argument below that Gay was not "qualified" under the ADA and RA ignored Plaintiff's evidence and presented an unduly narrow view of Plaintiff's claim. R.288-1 at 42. Plaintiff's operative complaint alleged that Gay was denied access to a range of rehabilitative services and programs. R.82 at 5, 22-24 (¶¶ 4, 66, 77). Nonetheless, the State characterized Plaintiff's claim as one for denial of access to mental health care only. R.288-1 at 42. Having misconstrued Plaintiff's claim, the State then asserted that Gay was not "qualified," because his disability was too "intertwined" with the services he sought. R.288-1 at 42 (citing *O'Guinn v. Nevada Dep't of Corrs.*, 468 Fed. Appx. 651, 653 (9th Cir. 2012) and *Wallace v. Jeffreys*, No. 17-cv-576, 2023 WL 2138337, at *24 (S.D. Ill. Feb. 21, 2023)).

The State's contentions regarding whether Gay was "qualified" miss the mark. Plaintiff's claim is about denial of access to programs and activities, not the adequacy of Gay's mental health treatment. *See McDaniel*, 115 F.4th at 828 (plaintiff's claim that denying his accommodation prevented him from moving freely throughout prison and impaired his participation in prison activities was not a claim about the adequacy of medical care). Plaintiff claims that Gay met essential eligibility requirements for, but was unable to access, programs including communal meals, congregate religious services, recreation activities, time out-of-cell, work opportunities, and rehabilitative programming. R.82 at 5, 22-24 (¶¶ 4, 66, 77); R.304 at 140. Additionally, because of his mental health disability, Gay could not receive the benefit of early release from the prison discipline program and had no meaningful opportunity to return to general population. R.304 at 140.

Accordingly, there is sufficient basis for a jury to find that Gay was a qualified individual with a disability within the meaning of the ADA and RA.

### C. The State's refusal to accommodate Gay's mental health disability in its prison discipline program was discriminatory.

Because of his mental health disability, Gay could not access and benefit from prison services, programs, and activities, he received an onslaught of disciplinary solitary confinement, and he deteriorated, engaging in extreme self-mutilation. Given these facts, a jury could conclude that the State's refusal to accommodate Gay's mental health disability when disciplining him was discriminatory.

### 1. The State's discipline program, out-of-cell time, communal meals, religious services, congregate recreation, work opportunities, and rehabilitative programming are all services, programs, or activities under the ADA and RA.

The Seventh Circuit has taken a wide view of the "services, programs, and activities" that are covered by the disability discrimination statutes. *See Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022) (holding that a handicapped-accessible toilet is a "service," such that denying access states an RA and ADA claim). Under the RA, a "program" includes "all of the operations" of the prison, *id.* (quoting 29 U.S.C. § 794(b)(1)(A)), and Title II of the ADA applies to "anything a public entity does," *id.* (quoting 28 C.F.R. Pt. 35, App. B). *See also Pennsylvania Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998) ("services, programs, or activities" includes recreational, educational, and vocational prison programs); *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (finding that deaf prisoner alleged ADA claim based on lack of meaningful access to prison's disciplinary process).

Here, Gay could not access the benefits that the State offered to non-disabled prisoners in the discipline program. Unlike a rational, mentally able prisoner, Gay could not earn his way out of solitary early by good behavior. And because of his mental health disability, he could not conform his behavior to prison rules in solitary confinement, which the State required if he was to leave disciplinary solitary confinement.

Thus, Gay lost access to prison programs. He could not go to the prison's church to participate in communal services, R.292-2 at 94-95 (372:15-374:23), could not work, R.292-16 at 13 (47:11-48:1), and could not participate in vocational programs, R.292-16 at 14 (49:7-15), or educational programs like college classes, R.292-16 at 14 (49:16-50:4). In general, his out-of-cell movement was restricted so that he could not access places like the prison yard or food hall, and he could not access programming off the unit. R.292-15 at 2-3; R.292-16 at 9-10 (32:19-36:17); R.301-15 at 12 (¶¶ 4, 8).

These services, programs, and activities are all "operations" of the prison. *See Reaves v. Dep't of Corr.*, 195 F. Supp. 3d 383, 421-23 (D. Mass. 2016) (finding that prison officials who relegated quadriplegic prisoner to his cell "violated the ADA by not allowing him to socialize with his peers in the prisons' common areas"). IDOC provides staffing (security, faith leaders, educational and vocational instructors), facilities, physical space, as well as materials for these programs and activities to occur.

Rehabilitative programs and congregate activities matter a great deal to prisoners. Conversing with other prisoners in a dayroom or walking the yard alongside a peer breaks up the monotony of prison life. The ability to go to a chapel and engage in silent prayer or gather with other people of faith for a religious service may provide prisoners with spiritual sustenance.[9] The difference between eating a

[9] On this point, the Sixth Circuit Court of Appeals has observed: "Most religious faiths give a central role to congregate religious services. It is an important aspect of religious socialization, and it

meal alone inside the same cell where one sleeps, urinates, and defecates, and eating at a table among others, is vast. Educational and vocational programs provide stimulation and enrichment, and further a prisoner's rehabilitation and the odds of successful reentry.

Because of Gay's disability, the State denied him the benefit of early release from solitary, denied him a meaningful opportunity to complete his discipline, excluded him from the aforementioned services, programs, and activities, and confined him to his cell for 22-24 hours a day, for 22 years.

### 2. The State needed to accommodate Gay in its prison discipline program to avoid discriminating against him on account of his mental health disability, but it failed to do so.

In the Seventh Circuit, a reasonable accommodation claim requires proof that "an accommodation is necessary to avoid discrimination." *Wisconsin Cmty. Servs.*, 465 F.3d at 751 (quoting 28 C.F.R. § 35.130(b)(7)); *see also Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 968 (7th Cir. 2018) (an accommodation is necessary if it "will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability") (citation omitted). The requisite proof includes showing that the "disability is what cause[d] [the] deprivation of the services or benefits desired." *Wisconsin Cmty. Servs.*, 465 F.3d at 752. Plaintiff has met this requirement.

---

imparts a sense of religious fellowship which deepens religious conviction. Prisoners are cut off from most kinds of normal social intercourse. Government should consider the matter carefully before walling prisoners off from congregate religious services which many believe reinforce norms of behavior which may help the inmate avoid future criminal conduct." *Walker v. Mintzes*, 771 F.2d 920, 930 (6th Cir. 1985).

The evidence shows that application of the prison discipline program against Gay was discriminatory on multiple levels.

For one, unlike a rational, able-bodied prisoner, Gay could not earn his way out of disciplinary solitary confinement and return to general population. R.301-15 at 49-50. Because of his mental health disability, Gay could not earn a reduction in his disciplinary solitary confinement sentence by modeling good behavior, and he accrued additional solitary confinement sentences that extended his disciplinary segregation term and kept him isolated.

Additionally, because of the State's failure to accommodate Gay's mental health disability in its prison discipline program, Gay could not access other IDOC programs and activities, including rehabilitative programming and congregate activities. In effect, the State segregated Gay from its non-disabled prison population.

Disciplinary solitary confinement was particularly harmful to Gay because of his mental health disability. R.301-15 at 6 (¶ 9). Disciplinary solitary exacerbated Gay's mental health disability, causing him to deteriorate and engage in self-mutilation. R.301-15 at 6 (¶ 9). Gay mutilated his body to distract himself from the acuity of the pain he suffered in solitary, R.301-15 at 43, and the self-harm was extreme, R.300-24 at 17 (61:17-21), 19 (69:17-70:1).

Moreover, the State repeatedly sanctioned Gay with disciplinary solitary confinement for conduct linked to his mental health disability, including for

possessing instruments for self-harm. R.300-18 at 112-14 (111:12-113:4); R.301-16 at 7 (¶ 27); R.301-17 at 38 (¶ 57).

The State needed to modify its discipline practices to accommodate Gay's mental health disability and stop discriminating against him. Multiple courts that have considered this issue have reached the same or similar conclusions. *See Saylor v. Nebraska*, 20-cv-264, 2021 WL 2593449, at *2 (D. Neb. June 24, 2021) ("[I]nsofar as Plaintiff[ ] alleges that because of his PTSD he has been placed in solitary confinement and has been excluded from participation in or denied the benefits of certain prison services, programs, and activities, a plausible claim for relief is stated."); *G.H. by and through Henry v. Marstiller*, 424 F. Supp. 3d 1109, 1120 (N.D. Fla. 2019) (plaintiffs stated a reasonable accommodation claim by alleging failure to modify disciplinary rules to accommodate erratic behaviors of psychiatric or developmentally disabled children and failure to modify isolation policies to provide for adequate out-of-cell time); *Latson v. Clarke*, 249 F. Supp. 3d 838, 865-66 (W.D. Va. 2017) (prisoner who alleged "increasingly severe and punitive conditions as a result of behavior that was a manifestation of his disabilities" stated an ADA claim).

In *Finley v. Huss*, the Sixth Circuit Court of Appeals considered an ADA claim where a prisoner alleged that administrators failed to accommodate his mental health disability by delaying his placement in a mental-health treatment program in lieu of disciplinary solitary confinement for a rule violation. 102 F.4th 789, 820-21 (6th Cir. 2024). The Sixth Circuit agreed that "[a] jury could find that failing to grant such an

accommodation would impede Finley's access to prison services or programming." *Id.* at 821. The Sixth Circuit further agreed that "[a] jury could similarly find that an accommodation was 'necessary' to avoid discrimination on the basis of Finley's disability," as "'but for' his mental illness, Finley would not have needed an accommodation to access basic prison services." *Id.* The Court concluded that Finley's reasonable accommodation claim did not survive summary judgment because the three-month delay in moving Finley out of solitary confinement was a moderate delay. *Id.* at 821-22. However, *Finley*'s reasoning and analysis supports Plaintiff's reasonable accommodation claim, as Gay did not receive any modification of his disciplinary segregation term to accommodate his mental health disability for 22 years.

IDOC also needed to accommodate Gay's mental health disability to avoid isolating him from non-disabled peers living in general population. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999) (holding that "[u]njustified isolation . . . is properly regarded as discrimination based on disability"); 28 C.F.R. § 35.130(d) (requiring a "public entity [to] administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities").

Additionally, disciplinary solitary confinement had a disparate impact on Gay because of his mental health disability, and the State was obliged to adjust its isolation practices to accommodate Gay's mental health disability. *See Kucinsky v. Jeffreys*, No. 23-cv-342, 2026 WL 1784683, at *4 (S.D. Ill. June 22, 2026) (plaintiff's allegation that IDOC violated his rights under the ADA and RA by, *inter alia*, "subjecting him to

isolating confinement that disparately impacted him due to his mental illnesses" sufficiently states a claim).

The Third Circuit Court of Appeals resolved an analogous claim in *Williams v. Secretary Pennsylvania Department of Corrections*, 117 F.4th 503 (3d Cir. 2024). Williams, a mentally ill prisoner, served 26 years in solitary confinement because he had a death sentence. *Id.* at 507. Williams argued that solitary was especially harmful to him due to his mental disability, and that the prison needed to take measures to reduce these harms pursuant to the ADA. *Id.* at 528. The prison argued that Williams' ADA claim failed because he was not in solitary "by reason of" his disability, but because of a rule requiring the isolation of all death row prisoners. *Id.* In siding with Williams, the Third Circuit held that "[a]ssuming Williams had a known mental illness, the DOC had an obligation to modify its practices to ameliorate the harms of prolonged solitary confinement on Williams." *Id.* at 529. The Third Circuit grounded this holding in the prison's "obligation to make 'reasonable modifications' to 'policies, practices, or procedures,' where . . . necessary to avoid discrimination on the basis of disability." *Id.* (citation omitted).

In *Finley*, the Sixth Circuit case, the Court similarly found that prison administrators had to make reasonable accommodations in prison discipline to avoid discrimination, where "[a] mentally stable person in Finley's position would have experienced living conditions in segregated housing that—though restrictive—wouldn't have produced nearly the same deleterious impact." 102 F.4th at 821.

Put simply, Gay's mental health disability obligated the State to modify its prison discipline program to avoid discriminating against him.

At summary judgment, the State asserted that Plaintiff cannot prove disability-based discrimination, because it was Gay's misconduct rather than his disability that landed him in solitary confinement. R.288-1 at 42-43 (citing *Wallace*, 2023 WL 2138337 at *24). The State's reliance on *Wallace* for this proposition is misplaced. In that case, the prisoner argued that solitary confinement created his mental illness. 2023 WL 2138337 at *24. Here, Plaintiff's contention is that solitary confinement exacerbated his mental illness. Moreover, the State's contention that it held Gay in solitary for disciplinary reasons, not because of his disability, "does not absolve the DOC of making reasonable accommodations to account for . . . mental illness in solitary confinement." *Hammond v. Pennsylvania Dep't of Corrs.*, No. 25-cv-00048, 2026 WL 2279774, at *17 (M.D. Pa. Aug. 6, 2026).

The State's argument also ignores Plaintiff's evidence showing that Gay's misconduct was a manifestation of his mental illness, and thus inextricable from his mental health disability. *See Larson v. Dep't of Human Svcs.*, No. 23-cv-1823, 2024 WL 4485572, at *16 (D. Minn. May 16, 2024) (rejecting motion to dismiss disability discrimination claim where defendants argued that plaintiff was placed in solitary due to his behavior and not his disability, because plaintiff alleged that behavior was linked to his PTSD); *Fultz v. Taylor*, No. 19-cv-557, 2023 WL 2328212, at *3 (N.D. Ind. Mar. 1, 2023) (evidence that disabled prisoner was deprived of basic hygiene and

communications as punishment for suicide attempts that were a manifestation of his disability was sufficient to survive summary judgment on RA claim); *G.H.*, 424 F. Supp. 3d at 1120 (plaintiff's allegation that he was retained in isolation for behaviors related to his disability stated a claim of disability discrimination).

It would be discriminatory to punish a wheelchair-bound prisoner for failing to stand for count, or to sanction a deaf prisoner for ignoring an order she could not hear, even though the prisoner's disobedience, not their disability, is the reason given for the discipline.

### 3. The State failed to make reasonable modifications to its prison discipline program to accommodate Gay's mental health disability.

The question of whether an accommodation is reasonable is "highly fact-specific, and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff." *Dadian v. Village of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001). "Accommodations must give 'meaningful access to the benefit that the grantee offers.'" *McDaniel*, 115 F.4th at 824 (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).

The evidence is sufficient for a jury to find that reasonable modifications could and should have been made to accommodate Gay's disability. For one, the State had mechanisms for reducing disciplinary segregation terms. R.292-16 at 30-31 (113:20-117:24), 34 (131:3-19); R.292-8 at 5, 10, 12; R.292-65 at 3. Additionally, when Gay was near the end of his prison sentence, the State released him from strict isolation and

allowed him to access congregate activities and programs. R.300-2 at 58-59 (228:21-229:21). Testimony that Gay did well with these accommodations is evidence of the reasonableness of such an accommodation. R.300-2 at 58-59 (229:22-230:18).

Moreover, the substantial benefit to Gay's health, overall wellbeing, and rehabilitation outweighs any costs associated with providing Gay access to IDOC programs and activities.

***

For all these reasons, a jury could find that the State discriminated against Gay by failing to make reasonable accommodations to its prison discipline program to accommodate his mental health disability. The State's request for summary judgment on Plaintiff's ADA and RA claims should have been denied, and these claims should go to trial.

## II. The State discriminated against Gay by refusing to make available inpatient hospitalization for his mental health disabilities.

The summary judgment record further shows that the State discriminated against Gay with respect to the availability of outside hospitalization. Whereas the State routinely arranged for prisoners suffering from physical ailments like cancer to be hospitalized when their treatment needs exceeded what was available within the walls of the IDOC, the State failed to make arrangements for prisoners with mental health disabilities to receive psychiatric hospitalization, including Gay. The State's conduct amounted to disability discrimination.

### A. Gay's inpatient designation and additional evidence of his serious psychiatric needs demonstrates that Gay had a disability and was qualified to receive inpatient psychiatric services.

Gay's mental health diagnoses and the routine, serious nature of his self-harm rendered him disabled within the meaning of the ADA and RA. *See* I.A, *supra*. Gay was also "qualified" to receive the services at issue, because he was eligible for inpatient psychiatric hospitalization. *See* I.B., *supra*.

Gay "need[ed] inpatient level of care," because his self-harming behaviors were "life threatening." R.301-3 at 2. Thus, his mental health provider determined that Gay required "a therapeutic environment including hospitalization." R.301-3 at 2.

Gay's mental health providers designated him as needing an inpatient level of care. R.300-15 at 21 (80:11-16); R.301-3 at 2; R.301-20 at 11. IDOC defined "inpatient" as the level of care that applied to patients whose needs "exceed[ ] the level of care that [IDOC] is able to provide and results in commitment to outside facilities[.]" R.300-12 at 13; R.301-1 at 29.[10]

Plaintiff identified this evidence in opposing summary judgment. R.304 at 96 (¶¶ 96, 99) & 134; R.336 at 14. The District Court overlooked it, incorrectly finding

[10] In response to Plaintiff's Motion for Reconsideration, the State criticized Plaintiff for relying on IDOC's proposed remedial plan from the *Rasho* litigation, R.345 at 10, and the District Court's Order denying reconsideration also faulted Plaintiff's reliance on the plan. App. at 26. However, the inpatient level of care designation is in the IDOC Administrative Directives, R.300-12 at 13, which Plaintiff cited, R.304 at 83 (¶ 20), and is also memorialized in the IDOC Standard Operating Procedural Manual for Mental Health, R.301-1 at 29.

that there were no facts indicating that Gay had received the inpatient designation. App. at 26.

The District Court also ruled against Plaintiff because there was no evidence that a mental health provider initiated a referral for Gay to go to an outside hospital for psychiatric care. App. at 26. The District Court missed the point: Gay's mental health providers could not send him to an outside hospital for inpatient psychiatric care, because the State failed to make the necessary arrangements for this to occur. Nevertheless, Gay's providers thought he needed inpatient hospital psychiatric care, and they identified him as someone who needed this level of care by designating him "inpatient." R.300-15 at 21 (80:11-16); R.301-3 at 2; R.301-20 at 11. Until the State arranged for its prisoners to receive inpatient psychiatric services, there was nothing more Gay's providers could do.

Additional evidence demonstrates that Gay was eligible for inpatient services. IDOC mental health providers determined that Gay had to be forcibly medicated with antipsychotic medication, because he was at substantial risk of harming himself due to his mental illness. R.301-2 at 2. This level of impairment would make him eligible for involuntary admission to a psychiatric hospital. *See Matter of Ingersoll*, 188 Ill. App. 3d 364, 368 (1989) ("An individual is subject to involuntary admission if the State establishes by clear and convincing evidence that a person is mentally ill and because of that illness, she is unable to provide for her basic needs so as to guard herself from serious harm."). Indeed, prison administrators believed that Gay would

need to be civilly confined after leaving prison, due to the severity of his mental illness. R.300-2 at 58 (228:7-13).

For these reasons, a jury could find that Gay met "essential eligibility" requirements for inpatient psychiatric hospitalization, and so was a qualified person with a disability for purposes of the ADA and RA.

### B. The State's failure to make inpatient hospitalization services for Gay's mental health disability available, despite providing inpatient hospitalization for prisoners with physical ailments, was discriminatory.

The State provided inpatient hospitalization for prisoners with physical ailments. R.161 at 32 (¶ 68); R.301-18 at 9. Yet the State did not provide access to inpatient hospitalization to Gay or any of the other prisoners with severe mental health disabilities designated as needing inpatient care. R.300-17 at 41 (157:14-159:22); R.300-26 at 14 (51:7-18). At one point, the State identified 46 prisoners as needing inpatient level of care, R.301-13 at 5,[11] all of whom, like Gay, were instead being housed in disciplinary segregation, R.301-13 at 6-7.

The provision of medical care is a service, exclusion from which can constitute discrimination under the disability statutes. *U.S. v. Georgia*, 546 U.S. 151, 157 (2006) ("deliberate refusal of prison officials to accommodate . . . disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs" could constitute "exclu[sion] from participation in . . . or deni[al] of the

[11] This number combines male and female prisoners.

benefits of" the prison's "services, programs, or activities") (quoting 42 U.S.C. § 12132); *see also Pennsylvania Dep't of Corrs.*, 524 U.S. at 210 ("services, programs, or activities" includes prison medical programs).

The State failed to provide mentally disabled prisoners, including Gay, the service of inpatient hospitalization for psychiatric treatment despite recognizing the need for these services, and despite an agreement between IDOC and IDHS contemplating the transfer of patients from IDOC to the State's Chester facility for inpatient mental health treatment. R.310 at 17 (¶ 57); R.301-13 at 9-10. The State has not explained why it sent no IDOC patients to IDHS for inpatient mental health care pursuant to this agreement. R.300-10 at 31-33 (31:2-33:8), 94-95 (94:2-95:6).

Without access to inpatient hospitalization, Gay spent significant time on crisis watch for his self-harm. R.292-34 at 47 (175:11-23); R.301-3 at 6. Gay needed stimulation to ameliorate the impact of isolation on his mental health disability, but on crisis watch he experienced severe isolation and restrictions. R.300-19 at 27-28 (102:17-105:8); R.292-2 at 55 (215:14-15).

Plaintiff's evidence that the State treated Gay differently because he had a mental health disability rather than a physical one is sufficient to require a trial as to whether the State discriminated against Gay because of his disability. *See Andrews v. Rauner*, No. 18-cv-1101, 2018 WL 3748401, at *5 (C.D. Ill. Aug. 6, 2018) (allegation that State Defendants discriminated against prisoner by denying her access to

hospitalization outside of the prison while allowing prisoners with physical injuries or illnesses to receive outside hospitalization stated a claim under the ADA and RA).

The discrimination is akin to the hypothetical scenario that the Seventh Circuit gave in *Amundson v. Wisconsin Department of Health Services*: "If [a state] buys the best available care for persons with visual impairments, but pays only for mediocre care for the developmentally disabled, then plaintiffs have a theory of discrimination[.]" 721 F.3d 871, 874 (7th Cir. 2013); *see also Lewis v. Aetna Life Ins.*, 982 F. Supp. 1158, 1168 (E.D. Va. 1997) (finding that an employee benefit that treated mental impairments worse than physical impairments violated the ADA, because "[b]oth a decision to deny coverage on the basis of mental disability and to provide inferior coverage for mental disabilities target the mentally disabled for inferior treatment . . . [i]n both cases, an insurer has subjected the mentally disabled individual to treatment inferior to that accorded to others solely on the basis of that individual's disability").[12]

Given the sharp disparity in the State's treatment of people with mental disabilities versus physical ailments with regard to inpatient hospitalization, it is reasonable to infer that the difference "results from beliefs that mental illness is less 'real' or debilitating than physical injury, or that individuals who claim to have mental

---

[12] In *E.E.O.C. v. CNA Ins. Cos.*, this Court held that it does not violate Title I of the ADA for a long-term pension plan to extend benefits for a longer period in cases of future physical impairment than in cases of future mental impairment. 96 F.3d 1039, 1044 (7th Cir. 1996). That holding does not foreclose relief on Plaintiff's disparate treatment theory, because the *CNA Ins.* decision turned on the fact that at the time the insurance plans were offered to employees, those employees were all able-bodied individuals, so there was no basis for discrimination. *Id.* Here, Gay was foreclosed from receiving inpatient hospital services at the time he was eligible for those services.

disabilities are more apt to be 'faking it.'" *Iwata v. Intel Corp.*, 349 F. Supp. 2d 135, 151 (D. Mass. 2004); *see also id.* at 155 (finding that it violated the ADA to provide more benefits for employees who could not work due to physical disability as opposed to mental disability). It is equally reasonable to infer that the State's disparate treatment of these two groups is based on the stereotype that people with mental illness are prone to be violent or dangerous and thus are riskier to manage offsite. Part of the ADA's mandate is to root out discriminatory treatment based on such "unwarranted assumptions" about disabled people. *See Olmstead*, 527 U.S. at 600.

### C. The District Court erred by ruling that Plaintiff's claim of discriminatory denial of access to medical services was a medical malpractice claim.

In granting summary judgment on Plaintiff's claim regarding inpatient hospitalization, the District Court reasoned that the RA does not create a remedy for medical malpractice or incompetent mental health treatment, thus the claim was not cognizable. App. at 15-16. The District Court relied on this Court's holding in *Bryant v. Madigan*, which rejected a paraplegic prisoner's claim that the failure to provide him pain medication and guardrails around his bed violated the ADA. 84 F.3d 246, 247, 249 (7th Cir. 1996). Pursuant to *Bryant*, "[t]he ADA does not create a remedy for medical malpractice." *Id.* at 249.

Plaintiff, however, is not bringing a medical malpractice action under the cloak of the ADA. *See Brown v. Meisner*, 81 F.4th 706, 709 (7th Cir. 2023) (holding that prisoner's claim that prison failed to accommodate his knee injury was "not about

allegedly substandard medical care," but about the need for accommodations, and thus adequately stated an ADA claim); *Paine v. Johnson*, No. 06-cv-3173, 2010 WL 785397, at *8 (N.D. Ill. 2010) (finding that evidence that City failed to accommodate arrestee's disability by failing to take mentally ill arrestee for a psychiatric evaluation or mental health treatment defeated summary judgment on ADA claim, and was not "a disguised medical malpractice claim"). Plaintiff does not allege that Gay's providers failed to meet the standard of care in treating his mental illness.

Rather, Plaintiff contends that the State excluded prisoners with mental health disabilities from accessing inpatient hospital services for their mental illness. This type of claim, alleging denial of access to medical services, is ground for relief under the ADA and RA. *See, e.g., Pesce v. Coppinger*, 355 F. Supp. 3d 35, 45-47 (D. Mass. 2018) (finding plaintiff was likely to succeed on his claim that refusing to provide methadone treatment for his opioid use disorder based on jail policy disallowing methadone was disability discrimination).

The First Circuit Court of Appeals held similarly in another access to medical services case, *Kiman v. New Hampshire Dep't of Corrs.*, 451 F.3d 274 (1st Cir. 2006). There, the First Circuit acknowledged that challenges to "a reasoned medical judgment with which the patient disagreed" sounded in medical malpractice, not the ADA. *Id.* at 285 (citation omitted). The Court determined that because the plaintiff showed he was denied access to necessary medications recommended by his provider, his denial of access to medical services claim under the ADA survived summary

judgment. *Id.* at 286-87. Consistent with the reasoning and result in *Kiman*, this Court should allow Plaintiff's claim regarding Gay's discriminatory exclusion from inpatient hospitalization services to proceed.

## CONCLUSION

The evidence at summary judgment requires a trial on Plaintiff's claim that the State discriminated against Anthony Gay when it refused to modify its prison discipline program to accommodate his mental health disability and instead held him in disciplinary solitary confinement for 22 years. The evidence also requires a trial on Plaintiff's claim that the State discriminated against Gay by refusing to provide him access to inpatient hospitalization to stabilize and manage his psychiatric disability, while providing inpatient hospital services to prisoners with physical ailments. The Court should reverse the district court's grant of summary judgment in favor of the State on Plaintiff's disability claims and remand this case for trial on those claims.

Respectfully submitted,

*<u>/s/ Maggie Filler</u>*

*One of Plaintiff-Appellant's Attorneys*

Locke Bowman
Maggie Filler
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, IL 60607
p. (312) 243-5900
e. maggie@loevy.com

Stephen Weil
ROMANUCCI & BLANDIN, LLC
321 North Clark St., Suite 900
Chicago, IL 60654
p. (312) 458-1000
e. sweil@rblaw.net

Attorneys for Plaintiff-Appellant
Maurisa Gay

## CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7)(B)(i)

The undersigned, counsel for the Plaintiff-Appellant, furnishes the following in compliance with Federal Rule of Appellate Procedure 32(a)(7):

I hereby certify that this brief conforms to the rules contained in Federal Rule of Appellate Procedure 32(a)(7) for a brief produced with a proportionally spaced font. The length of this brief is 11,501 words, excluding those portions of the brief listed in Federal Rule of Appellate Procedure 32(f) that do not count toward the word limitation. In preparing this certificate, I relied on the word count tool of the word-processing system used to prepare the brief, Microsoft Word.

Dated: November 6, 2026

*/s/ Maggie Filler*
*One of Plaintiff-Appellant's Attorneys*

Locke Bowman
Maggie Filler
LOEVY & LOEVY
311 North Aberdeen Street,
Chicago, IL 60607
p. (312) 243-5900
e. maggie@loevy.com

Stephen Weil
ROMANUCCI & BLANDIN, LLC
321 North Clark St., Suite 900
Chicago, IL 60654
p. (312) 458-1000
e. sweil@rblaw.net

Attorneys for Plaintiff-Appellant
Maurisa Gay

## SHORT APPENDIX

District Court Order on Defendants' Motion for Summary Judgment ......................... 1

District Court Order on Plaintiff's Motion for Reconsideration .................................. 27

E-FILED
Thursday, 04 September, 2025 02:02:34 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| **MAURISA GAY,** *Representative of the Estate of Anthony Gay,* | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-cv-1133-SEM** |
| | ) | |
| **JOHN BALDWIN,** ***et al*****,** | ) | |
| **Defendants.** | ) | |

# ORDER

**SUE E. MYERSCOUGH, United States District Judge:**

Before the Court is a Motion for Summary Judgment (Doc. 288-1) filed by Defendants John Baldwin, Sylvia Butler, Dr. Jamie Chess, Dr. Melvin Hinton, Rob Jeffreys, Terri Kennedy, Michael Melvin, Sonja Nicklaus, Shane Reister, Emily Ruskin, Jeff Sims, John Varga, and Justin Wilks. Plaintiff Maurisa Gay, representative of the estate of Anthony Gay,[1] has responded (Doc. 304), and Defendants have replied (Doc. 310). For the following reasons, the Court grants the dispositive motion.

---

[1] Hereinafter, the Court refers to Anthony Gay as Anthony and Maurisa Gay as Plaintiff.

# I. BACKGROUND

## A. Plaintiff's Amended Pleading

On March 7, 2020, Plaintiff filed a four-count First Amended Complaint (Doc. 82), alleging constitutional and statutory violations during Anthony's incarceration at the Illinois Department of Corrections ("IDOC"). Plaintiff's allegations included an Eighth Amendment deliberate indifference to serious mental health needs claim against Defendants Baldwin, Butler, Chess, Hinton, Kennedy, Melvin, Nicklaus, Reister, Ruskin, Sims, Varga, and Wilks (count I); statutory violations of the Americans with Disability Act ("ADA") (count II) and Rehabilitation Act of 1973 (count III) against former IDOC Director Rob Jeffreys in his official capacity; and a Fourteenth Amendment due process claim against Kennedy, Melvin, Nicklaus, Ruskin, Varga, and Wilks.

Plaintiff explained that Anthony suffered from severe mental illnesses that placed him at risk of serious harm and required intense treatment. Instead, Defendants held Anthony in solitary confinement for years. Deprived of any human contact, he engaged in horrific acts of self-mutilation and assaulted prison staff with bodily fluids. (Pl. Amend. Compl., Doc 82 at 3, 19-20.)

**B. Plaintiff's Concessions and the Court's Substitution**

Plaintiff's response to Defendants' dispositive motion states that she does not contest the dismissal of her Eighth Amendment claims against Defendants Baldwin, Butler, Chess, Hinton, Kennedy, Melvin, Nicklaus, Reister, Ruskin, Sims, Varga, and Wilks. (Pl. Res., Doc. 304 at 150.) Plaintiff also abandons her Fourteenth Amendment Due Process claim against Kennedy, Melvin, Nicklaus, Ruskin, Varga, and Wilks. (*Id.*) Plaintiff explains that discovery has revealed that Anthony's mistreatment was induced by policies adopted by IDOC that were deliberately indifferent to the plight of severely mentally ill IDOC patients and that Anthony suffered for decades as a result. Thus, the remaining claims are Plaintiff's statutory claims under the ADA (count II) and Rehabilitation Act (count III).

The Court directs the Clerk of the Court to substitute Latoya Hughes, in her official capacity as the IDOC director, for Rob Jeffreys. *See* Fed. R. Civ. P. 25(d) (noting when a public officer who is a party in an official capacity ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party).

## II. ADA and REHABILITATION ACT STANDARDS

"In 1990, Congress enacted the [Americans with Disabilities Act] to provide 'a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Lacy v. Cook County*, 897 F.3d 847, 852 (7th Cir. 2018) (quoting 42 U.S.C. § 12101(b)(1)). "To prove a prima facie case of discrimination under Title II, a plaintiff must show: (1) that he is a qualified individual with a disability; (2) that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity; and (3) that the denial or discrimination was by reason of his disability." *Id.* at 853 (internal quotation marks omitted) (quoting *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996)).

A Rehabilitation Act claim is functionally identical to an ADA claim. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). Both "require[] the plaintiff to allege that '(1) he is a qualified person (2) with a disability and (3) the [state agency] denied him access to a program or activity because of his disability.'" *Id.* (quoting *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012)); *see also Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 873 (7th Cir. 2013)

("[T]he Rehabilitation Act and the ADA are substantively identical" which "means that the Rehabilitation Act by itself affords plaintiffs any relief to which they may be entitled; claims under the ADA become academic.").

"[T]he analysis governing each statute is the same except that the Rehabilitation Act includes as an additional element the receipt of federal funds, which all states accept for their prisons." *Jaros*, 684 F.3d at 671. "As a practical matter, then, [courts] may dispense with the ADA and the thorny question of sovereign immunity, since [a plaintiff] can have but one recovery." *Id.* at 672. "Illinois has waived its immunity from suits for damages under the Rehabilitation Act as a condition of its receipt of federal funds." *Id.* at 672 n.5.

No personal liability exists under Title II of the ADA or the Rehabilitation Act. *See Stanek v. St. Charles Cmty. Unit Sch. Dist. #303*, 783 F.3d 634, 644 (7th Cir. 2015) (concluding the district court was correct to dismiss the individual defendants sued in their individual capacity for the discrimination and retaliation claims arising directly under the Rehabilitation Act and the ADA); *Jaros*, 684 F.3d at 670 ("[E]mployees of the Department of Corrections are not

amenable to suit under the Rehabilitation Act or the ADA." (citing 29 U.S.C. § 794(b); 42 U.S.C. § 12131)).

Thus, the Court limits its analysis to the assertion that IDOC is entitled to summary judgment on Plaintiff's Rehabilitation Act claim. *See Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.").

**III. Statute of Limitations**

Before considering Defendant Hughes' Motion for Summary Judgment, the Court addresses Hughes' affirmative defenses.

**A. Procedural History**

In September 2019, District Judge Colin Stirling Bruce denied Defendants' request to dismiss Plaintiff's claims that occurred before October 28, 2016, concluding that "[a]lthough further discovery may prove otherwise, at this stage of the proceeding, … the continuing violation doctrine tolls Plaintiff's claims against Defendants." (Doc. 44 at 12.)

In January 2021, Defendants filed a Partial Motion to Dismiss, in which they argued that the continuing violation doctrine did not

apply to this case. District Judge Harold A. Baker denied Defendants' motion, concluding that the law of the case doctrine applied and declining to reconsider in the absence of extraordinary circumstances. (Doc. 116 at 1-4); *see also Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571–72 (7th Cir. 2006) ("The authority of a district judge to reconsider a previous ruling in the same litigation, whether a ruling made by him or by a district judge previously presiding in the case, including (because the case has been transferred) a judge of a different court, is governed by the doctrine of the law of the case, which authorizes such reconsideration if there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous.").

**B. Statute of Limitations and Continuing Violation Doctrine**

"The statute of limitations for suits under section 1983 is supplied by state law . . . ." *Heard v. Sheahan*, 253 F.3d 316, 317 (7th Cir. 2001); *see also Untermyer v. College of Lake County*, 284 F. App'x 328, 329-330 (7th Cir. 2008) (affirming dismissal of Rehabilitation Act claim under Illinois' two-year statute of limitations). "Federal law, however, governs the accrual of claims,"

*Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993), and the continuing violation doctrine is "best characterized as a doctrine governing the accrual of a claim." *Pitts v. City of Kankakee*, 267 F.3d 592, 595 (7th Cir. 2001).

To determine whether the continuing violation doctrine applies, the key inquiry is whether the constitutional deprivation "was a fresh act each day, or whether it was a discrete act that took place upon the first [instance] that merely had lingering consequences." *Savory v. Lyons*, 469 F.3d 667, 673 (7th Cir. 2006); *see also United States v. Midwest Generation, LLC*, 720 F.3d 644, 646 (7th Cir. 2013) ("The phrase 'continuing violation' is ambiguous [and] may mean any of at least three things: (1) ongoing discrete violations; (2) acts that add up to one violation only when repeated; and (3) lingering injury from a completed violation. Analysis will be easier if we call the first situation a continuing violation, the second a cumulative violation, and the third a continuing-injury situation.").

"The emphasis is not upon the effects of earlier . . . decisions; rather, it is upon whether any present violation exists." *Savory*, 469 F.3d at 673 (quoting *Del. State Coll. v. Ricks*, 449 U.S. 250, 258

(1980) (citations and quotations omitted)); *see also Manuel v. City of Joliet*, 903 F.3d 667, 669 (7th Cir. 2018) ("When a wrong is ongoing …, the period of limitations does not commence until the wrong ends. Notice that we speak of a continuing wrong, not of continuing harm; once the wrong ends, the claim accrues even if that wrong has caused a lingering injury." (emphasis in original) (citation omitted).

As noted earlier, the remaining issue is a Rehabilitation Act claim against Defendant Hughes in her official capacity, which is a claim against IDOC. As to this sole claim, Plaintiff alleges that by placing Anthony in solitary confinement, which deprived him access to services, programs, and activities, including education, programming, recreation, exercise, and mental health services, IDOC discriminated based on Anthony's mental health in violation of the Rehabilitation Act.

Defendant Hughes asserts that the continuing violation doctrine is inapplicable, relying on *Bernard v. Scott* for the proposition that cases involving a genuine continuing violation concern "'violations' that last as long as the 'defendant [has] the power' to remedy the plaintiff's condition but fails to do so." 501 F.

Supp.3d 611, 621-622 (N.D.Ill. 2020) (quoting *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 517-18 (7th Cir. 2019)).

Defendant Hughes contends that "Defendants … did not have the power to remedy [Anthony's] condition, much less did Defendants engage in an ongoing and protracted refusal to do so." (Def. MSJ., Doc. 288-1 at 25.) Although the Court infers that Defendant Hughes' stance concerns the individual Defendants, who are no longer parties, the Court notes that Hughes neither explicitly argues nor does the record support the notion that IDOC was powerless to address the allegations contained in Plaintiff's Rehabilitation Act claim, which the Court construes in the light most favorable to Plaintiff. *See Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017) ("When a plaintiff alleges that inaction is leading to an ongoing harm, [s]he can 'reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unreasonable to require or even permit [her] to sue separately over every incident of the defendant's unlawful conduct.'") (quoting *Heard*, 253 F.3d at 319.

Furthermore, the Court concludes that Defendant Hughes has not satisfied her burden of showing that *res judicata* bars any violations that Plaintiff raises before October 3, 2012.

"The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). "Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001). "Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law … litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *Id.* at 748-49.

"Res judicata has three elements: '(1) an identity of the parties or their privies; (2) [an] identity of the cause of action; and (3) a final judgment on the merits.'" *Matrix IV, Inc. v. Am. Nat'l Bank & Tr. Co.*, 649 F.3d 539, 547 (7th Cir. 2011) (quoting *Alvear-Velez v. Mukasey*, 540 F.3d 672, 677 (7th Cir. 2008)).

Despite Defendant Hughes' claim that *res judicata* applies to bar Plaintiff's Rehabilitation Act claim, Hughes does not provide any facts that demonstrate Plaintiff previously litigated an ADA or Rehabilitation Act claim against IDOC.

## IV. SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "If the moving party has properly supported his motion, the burden shifts to the non[]moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015).

"When opposing a properly supported motion for summary judgment, the non[]moving party must 'cit[e] to particular parts of materials in the record' or 'show[] that the materials cited do not establish the absence … of a genuine dispute.'" *Melton v. Tippeconoe County*, 838 F.3d 814, 818 (7th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)). All facts must be construed in the light most favorable to the non[]moving party, and all reasonable inferences must be drawn in his favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A scintilla of evidence supporting the nonmovant's position is insufficient to defeat a motion for summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

**B. Discussion**

As earlier noted, a Rehabilitation Act claim requires a plaintiff to show that he is a qualified person, with a disability and a state agency denied him access to a program or activity because of his disability. *Wagoner*, 778 F.3d at 592. The crux of the parties' dispute concerns the interpretation of Plaintiff's Rehabilitation Act claim.

Defendant Hughes asserts that Plaintiff's Rehabilitation Act claim fails because it focuses on the type of mental health care provided instead of discrimination based on the denial of access to a program or activity because of Plaintiff's disability.

In support, Hughes relies on the Illinois Southern District Court's unpublished decision in *Wallace v. Jeffreys*, which concluded:

> [Plaintiff] argues that the Defendants created his mental disability by placing him in prolonged segregation, and then they failed to accommodate his dwindling mental health by keeping him in segregation *because of* his mental health. Plaintiff was originally placed in segregation for discipline and to maintain safety and security. Plaintiff has not identified any specific evidence that shows he was kept in segregation because of his mental health, either when he was first placed or later when he was kept segregated. Thus, Plaintiff was not housed in segregation because of his disability, and he was not deprived of services or programs *based on* his disability.

2023 U.S. Dist. LEXIS 28725, *74-75, 2023 WL 2138337.

As in *Wallace*, Plaintiff's Rehabilitation Act claim is that Anthony's mental disability caused him to commit acts of misconduct, which affected his placement in segregation. As a result, Plaintiff's mental health deteriorated, which further caused him to

engage in self-mutilation and staff assaults, lengthening his time in segregation and his prison sentence.

From this basis, Plaintiff states that IDOC failed to provide Anthony "the reasonable accommodation of inpatient psychiatric treatment," which deprived him "of access to services, programs, and activities, including education, programming, recreation, exercise, human interaction, and mental health treatment and services. (Doc. 82 at 23:70.)

Plaintiff acknowledges that she does not assert that Anthony did not receive any medical care. Instead, she claimed that Anthony's "mental healthcare was ineffective because it was administered while he remained in disciplinary segregation." (Pl. Res., Doc 304 at 148.) Of note is the absence of any facts demonstrating discrimination by IDOC based on Anthony's mental health disability. Instead, Plaintiff asserts that Anthony was not given special consideration in the form of a referral to an inpatient facility. In this regard, the parties do not dispute that no medical or mental health professional recommended that Anthony be transferred to an outside mental health facility to receive medical or mental healthcare. (*Id.* at 31:74.) Regardless, the Rehabilitation Act does not create a remedy for medical malpractice

or incompetent treatment of medical or mental health conditions. *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

Accordingly, given Plaintiff's concessions, the Court grants Defendant Hughes' Motion for Summary Judgment.

**IT IS THEREFORE ORDERED:**

1) **Defendants' Motion for Summary Judgment (Doc. 288) is GRANTED.**

2) **The Court directs the Clerk to substitute Latoya Hughes, in her official capacity as the IDOC director, for Rob Jeffreys.**

3) **The Clerk is DIRECTED to terminate John Baldwin, Sylvia Butler, Dr. Jamie Chess, Dr. Melvin Hinton, Latoya Hughes, Terri Kennedy, Michael Melvin, Sonja Nicklaus, Shane Reister, Emily Ruskin, Jeff Sims, John Varga, and Justin Wilks as Defendants.**

ENTERED September 4, 2025.

s/ *Sue E. Myerscough*

SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE

E-FILED
Wednesday, 03 December, 2025 02:23:56 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| **MAURISA GAY,** *Representative of the Estate of Anthony Gay,* | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-cv-1133-SEM** |
| | ) | |
| **JOHN BALDWIN,** ***et al*****,** | ) | |
| **Defendants.** | ) | |

**ORDER**

**SUE E. MYERSCOUGH, United States District Judge:**

Before the Court is a Motion for Reconsideration (Doc. 336) filed by Plaintiff Maurisa Gay, representative of the estate of Anthony Gay[1]. Defendant Latoya Hughes, in her official capacity as Director of the Illinois Department of Corrections ("IDOC"), has filed a Motion for Extension of Time (Doc. 340) to file a response. Plaintiff opposes the length of time requested (Doc. 341). Defendant has since filed a response (Doc. 345) to Plaintiff's Motion for Reconsideration. Plaintiff has subsequently filed a Motion for Leave to File a Reply (Doc. 346).

[1] Hereinafter, the Court refers to Anthony Gay as Anthony and Maurisa Gay as Plaintiff.

Defendant Hughes' Motion for Extension of Time is granted over Plaintiff's objection, Plaintiff's Motion for Leave to File a Reply is denied, and Plaintiff's Motion for Reconsideration is denied for the following reasons.

## I. BACKGROUND

In March 2020, Plaintiff filed an Amended Complaint (Doc. 82), alleging constitutional and statutory violations during Anthony's IDOC imprisonment. Specifically, Plaintiff alleged an Eighth Amendment deliberate indifference to serious mental health needs claim (count I); claims under the Americans with Disabilities Act ("ADA") and Rehabilitation Act of 1973 ("RA") against Defendant Hughes in her official capacity as IDOC Director; and a Fourteenth Amendment due process claim (count IV).

Defendants filed a Motion for Summary Judgment (Doc. 288) on Plaintiff's claims. In Plaintiff's response, she explicitly stated that she did not contest the dismissal of her due process claims or the individual Defendants named, except for her Eighth Amendment claim against Defendant physician Nunez.[2] (Doc. 304

[2] Defendant Nunez was not a party to the dispositive motion filed.

at 150.) As noted, the Motion for Reconsideration concerns the Court's grant of summary judgment on Plaintiff's official capacity claims against Defendant Hughes under the ADA and RA.

## II. PRELIMINARY ISSUES

Defendant's Motion for Extension of Time (Doc. 340) to file a response to Plaintiff's Motion for Reconsideration is granted over Plaintiff's objections (Doc. 341).

Central District of Illinois Local Rule 7.1(B)(3) instructs that "[a] reply to the response is only permitted with leave of Court. The motion for leave must be filed within [seven] days after service of the response and include the proposed reply as an exhibit." Civil LR 7.1(B)(3). Plaintiff seeks to file a reply to correct what she characterizes as Defendant's misdirection and obfuscation. After reviewing the parties' briefs, the Court concludes that no further briefing is required to address Plaintiff's Motion for Reconsideration. Accordingly, Plaintiff's Motion for Leave to File a Reply (Doc. 346) is denied.

## III. RECONSIDERATION

### A. Legal Standard

Because the Court's grant of summary judgment did not dispose of all claims against all parties, Plaintiff's Motion for Reconsideration proceeds under Federal Rule of Civil Procedure ("Rule") 54(b). Rule 54(b) provides that "any order or other decision … that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *See Patrick v. City of Chicago*, 103 F. Supp. 3d 907, 911 (N.D. Ill. 2015) ("Motions to reconsider interlocutory orders are governed by Federal Rule of Civil Procedure 54(b).")

Motions for reconsideration under Rule 54(b) "serve the limited function of correcting manifest errors of law or fact." *Slick v. Portfolio Recovery Assocs.*, LLC, 111 F. Supp. 3d 900, 902 (N.D. Ill. 2015) (internal quotation marks and citation omitted). A party may also use a motion for reconsideration to alert the court to "a significant change in the law or facts." *Janusz v. City of Chicago*, 78 F. Supp. 3d 782, 787 (N.D. Ill. 2015), aff'd, 832 F.3d 770 (7th Cir. 2016).

**B. The Court's Determination**

Plaintiff claimed that Anthony's mental disability caused him to commit acts of misconduct, which resulted in his placement in disciplinary segregation. As a result, Anthony's mental health deteriorated, which further caused Anthony to engage in self-mutilation and staff assaults, which lengthened his segregation time and prison sentence. (MSJ Ord., Doc. 344 at 14-15.)

Plaintiff clarified that she was not asserting Anthony did not receive care but instead that Anthony's "mental healthcare was ineffective because it was administered while he remained in disciplinary segregation." (Pl. MSJ Res., Doc 304 at 147-48.) In this regard, Plaintiff asserted in her amended pleading that IDOC failed to provide Anthony "the reasonable accommodation of inpatient psychiatric treatment," which essentially deprived him "of access to services, programs, and activities, including education, programming, recreation, exercise, human interaction, and mental health treatment and services. (Doc. 82 at 23:70.)

The Court cited the Illinois Southern District Court's unpublished decision in *Wallace v. Jeffreys*, 2023 WL 2138337 (S.D. Ill. 2023). In *Wallace*, the district court initially noted that the ADA

and RA do not apply to claims alleging medical malpractice or the incompetent treatment of a condition. *Id.* at *24. The Court also rejected the plaintiff's argument that the defendants caused his mental disability by prolonged placement in segregation and then failed to accommodate the plaintiff's dwindling mental health by keeping him in segregation. *Id.*

This Court rejected Plaintiff's argument that, despite Anthony receiving mental health treatment that Plaintiff claims was ineffective, Defendant Hughes violated the ADA and RA by failing to transfer Anthony from segregation and provide him "with the reasonable accommodation of inpatient intensive psychiatric treatment." (Pl. Amend. Compl., Doc. 82 at 23:70; MSJ Ord., Doc. 344 at 15-16.)

**C. Plaintiff's Grounds**

Plaintiff indicates in her Motion for Reconsideration that she had abandoned the claim the Court considered in granting Defendant's dispositive motion. Specifically, Plaintiff states as follows:

> The Court correctly quoted Paragraph 70 of Plaintiff's complaint. It is also true that, early in the case, Plaintiff proffered the theory that

> IDOC's failure to adjust the mental health treatment to accommodate Mr. Gay was in violation of federal disability law. But by the time of the summary judgment briefing, Plaintiff had abandoned that theory. Instead, Plaintiff focused in her summary judgment response on the separate theory – articulated in paragraph 67 of the operative complaint – that the failure to accommodate the *disciplinary process* was in violation of the ADA and RA.

(Pl. Mot. to Rec., Doc. 336 at 10-11 (emphasis in original)).

In this regard, Plaintiff asserts that the Court failed to consider the "contours of the claim [she] was pressing." (Doc. 336 at 8.) The operative claim Plaintiff refers to in support of her ADA and RA claim provides, as follows:

> Based on their ongoing discriminatory policies, Defendants further failed to accommodate Anthony's disabilities in the IDOC's disciplinary processes, and they discriminated against him by deliberately isolating him on account of his mental illness.

(Doc. 82 at 22:67.)

Plaintiff asserts that "she is entitled to a trial as to whether [Anthony] required an accommodation of []his disability by modifying the IDOC's disciplinary procedures to remove him from disciplinary segregation." (Pl. Mot. to Rec., Doc. 336 at 4.) In

support, Plaintiff presents facts from an expert who opined that Anthony required removal from disciplinary segregation to engage in pro-social behavior. (*Id.*) In this regard, Plaintiff reports that, upon Anthony's eventual release from solitary confinement, he did well in the general population.

Thus, Plaintiff essentially contends that Anthony was not provided a special accommodation, which Plaintiff identifies as Anthony's release from segregation to ameliorate his mental health issues. Specifically, Plaintiff posits that an appropriate, reasonable accommodation was to "release [Anthony] from solitary confinement notwithstanding [his] disciplinary … tickets." (Pl. Amend. Compl., Doc. 82 at 19:43, 21:63, 23:70; Pl. Mot to Rec., Doc. 336 at 3, 9, 12.)

However, "[t]he primary mandate of Title II is that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Lacy v. Cook County*, 897 F.3d 847, 852 (7th Cir. 2018) (quoting 42 U.S.C. § 12132).

There are no facts demonstrating that IDOC excluded or refused to modify a rule, regulation, or policy that prevented Plaintiff from participating in a program, service, or activity made available to other inmates. Additionally, Plaintiff's assertions are couched in terms of deficient or alternative mental health treatment for Anthony's condition, which, as already noted, is inapplicable under the ADA or RA. *See Brown v. Meisner*, 81 F.4th 706, 709 (7th Cir. 2023) ("[T]he ADA 'does not create a remedy for medical malpractice.'") (quoting *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)).

Plaintiff also states that IDOC discriminated against Anthony, who was designated as requiring an "inpatient level of care," which is a "formal designation that was reserved for patients who 'require a level of treatment that exceeds the level of care that [IDOC] is able to provide *and results in commitment to outside facilities*.'" (Pl. Mot. to Rec., Doc. 336 at 10-11 (emphasis in original)). Plaintiff asserts that the "inpatient" designation was "*the means*" by which an IDOC mental healthcare provider could "recommend" that a patient be transferred to an outside facility for mental healthcare. (*Id.* at 14; Pl. MSJ Res., Doc. 301-13 at 1-26 (emphasis in original)).

Despite Plaintiff's reliance on a 2014 memorandum, titled "IDOC Proposed Remedial Plan," Plaintiff does not provide facts that Anthony received the qualifying designation, that a determination was made that IDOC was not able to treat Anthony's mental health condition adequately, or that IDOC refused to comply with an inpatient mental health referral issued to Anthony.

As noted by Defendant, Plaintiff's assertion that Anthony's mental health providers could not refer Anthony to an outside facility for mental health care is belied by the record and Plaintiff's admission in her amended pleading regarding the ability of the mental health providers to refer Anthony for inpatient mental health treatment. (Def. Res., Doc. 345 at 10; Pl. Amend. Compl., Doc. 82 at 18:42(c)).

Therefore, Plaintiff's Motion to Reconsider (Doc. 336) is denied.

**IT IS THEREFORE ORDERED:**

1) **Defendant's Motion for Extension of Time (Doc. 340) is GRANTED.**

2) **Plaintiff's Motion for Leave to File a Reply (Doc. 346) is DENIED.**

3) **Plaintiff's Motion for Reconsideration (Doc. 336) is DENIED.**

ENTERED December 3, 2025.

s/ *Sue E. Myerscough*

SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Seventh Circuit Rule 30(d), undersigned counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the Appendix.

Dated: November 4, 2026

*/s/ Maggie Filler*

*One of Plaintiff-Appellant's Attorneys*

Locke Bowman
Maggie Filler
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, IL 60607
p. (312) 243-5900
e. maggie@loevy.com

Stephen Weil
ROMANUCCI & BLANDIN, LLC
321 North Clark St., Suite 900
Chicago, IL 60654
p. (312) 458-1000
e. sweil@rblaw.net

Attorneys for Plaintiff-Appellant
Maurisa Gay

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant believes that oral argument would be helpful to the Court in this case to allow for additional development of the factual and legal issues, and thus respectfully asks the Court to permit oral argument.

## CERTIFICATE OF COMPLIANCE WITH THIS COURT'S ELECTRONIC CASE FILING PROCEDURE (C)(3)

I, Maggie Filler, hereby certify that I have filed the Brief of Plaintiff-Appellant electronically in searchable PDF format, as required by this Court's electronic case filing procedure (c)(3).

Dated: November 6, 2026

*<u>/s/ Maggie Filler</u>*

*One of Plaintiff-Appellant's Attorneys*

Locke Bowman
Maggie Filler
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, IL 60607
p. (312) 243-5900
e. maggie@loevy.com

Stephen Weil
ROMANUCCI & BLANDIN, LLC
321 North Clark St., Suite 900
Chicago, IL 60654
p. (312) 458-1000
e. sweil@rblaw.net

Attorneys for Plaintiff-Appellant
Maurisa Gay

## CERTIFICATE OF SERVICE

The undersigned, counsel for the Plaintiff-Appellant, Maurisa Gay, hereby certifies that on November 6, 2026, the Brief and Required Short Appendix of Appellant was filed on ECF, thereby effecting electronic service on counsel for Defendant-Appellee Latoya Hughes.

Dated: November 6, 2026

*/s/ Maggie Filler*

*One of Plaintiff-Appellant's Attorneys*

Locke Bowman
Maggie Filler
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, IL 60607
p. (312) 243-5900
e. maggie@loevy.com

Stephen Weil
ROMANUCCI & BLANDIN, LLC
321 North Clark St., Suite 900
Chicago, IL 60654
p. (312) 458-1000
e. sweil@rblaw.net

Attorneys for Plaintiff-Appellant
Maurisa Gay