No. 26-2403

# In the United States Court of Appeals for the Seventh Circuit

MAURISA GAY,

*Plaintiff-Appellant*,

v.

LATOYA HUGHES,

*Defendant-Appellee*,

*On Appeal from the United States District Court for the Central District of Illinois, No. 1:19-cv-01133-SEM-EIL (Bruce, J.)*

## BRIEF OF AMICI CURIAE STUART GRASSIAN, M.D. AND CRAIG W. HANEY, PH.D., J.D. IN SUPPORT OF PLAINTIFF-APPELLANT MAURISA GAY AND REVERSAL


Leslie Kuhn-Thayer
Harry Dodsworth
Timothy E. Cunningham, Jr.
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
lkuhntha@sidley.com
hdodsworth@sidley.com
tim.cunningham@sidley.com

Peter A. Bruland
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202.736.8000
pbruland@sidley.com

*Counsel for Amici Curiae*

Save As Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2403

Short Caption: Maurisa Gay, Plaintiff-Appellant v. Latoya Hughes, Defendant-Appellee

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Stuart Grassian, M.D.

Craig W. Haney, Ph.D., J.D.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Timothy E. Cunningham, Jr. Date: 11/12/2026

Attorney's Printed Name: Timothy E. Cunningham, Jr.

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: Sidley Austin LLP, One South Dearborn, Chicago, IL 60603

Phone Number: (312) 853-7000 Fax Number: (312) 853-7036

E-Mail Address: tim.cunningham@sidley.com

Save As    Clear Form

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2403

Short Caption: Maurisa Gay, Plaintiff-Appellant v. Latoya Hughes, Defendant-Appellee

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Stuart Grassian, M.D.

Craig W. Haney, Ph.D., J.D.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Peter A. Bruland    Date: 11/12/2026

Attorney's Printed Name: Peter A. Bruland

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Sidley Austin LLP, 1501 K St., NW, Washington, D.C. 20005

Phone Number: (202) 736-8000    Fax Number: (202) 736-8711

E-Mail Address: pbruland@sidley.com

Save As | Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2403

Short Caption: Maurisa Gay, Plaintiff-Appellant v. Latoya Hughes, Defendant-Appellee

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Stuart Grassian, M.D.

Craig W. Haney, Ph.D., J.D.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Leslie Kuhn-Thayer Date: 11/12/2026

Attorney's Printed Name: Leslie Kuhn-Thayer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Sidley Austin LLP, One South Dearborn, Chicago, IL 60603

Phone Number: (312) 853-7000 Fax Number: (312) 853-7036

E-Mail Address: lkuhntha@sidley.com

Save As | Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2403

Short Caption: Maurisa Gay, Plaintiff-Appellant v. Latoya Hughes, Defendant-Appellee

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Stuart Grassian, M.D.

Craig W. Haney, Ph.D., J.D.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Harry Dodsworth Date: 11/12/2026

Attorney's Printed Name: Harry Dodsworth

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Sidley Austin LLP, One South Dearborn, Chicago, IL 60603

Phone Number: (312) 853-7000 Fax Number: (312) 853-7036

E-Mail Address: hdodsworth@sidley.com

**TABLE OF CONTENTS**


INTEREST OF AMICI CURIAE .......... 1

ARGUMENT .......... 3

I. Solitary confinement is uniquely harmful to prisoners with serious mental illness and causes a cycle of punishment. .......... 3

A. Solitary confinement deprives prisoners of necessary social interaction and environmental stimulation. .......... 5

B. The psychological and physical harm from solitary confinement is well established. .......... 7

C. Individuals with pre-existing mental illness suffer even greater harm from solitary confinement. .......... 10

II. Accommodating mentally-ill prisoners by employing non-solitary alternatives furthers prison goals. .......... 13

A. For mentally-ill prisoners, solitary confinement can do more harm than good. .......... 14

B. Prisons more effectively deter bad behavior and reduce violence when they reduce or eliminate solitary confinement .......... 16

CONCLUSION .......... 20

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Apodaca v. Raemisch*,
586 U.S. 931 (2018) .......... 2, 3

*Brown v. Plata*,
563 U.S. 493 (2011) .......... 2

*Davis v. Ayala*,
576 U.S. 257 (2015) .......... 2

*Gevas v. McLaughlin*,
798 F.3d 475 (7th Cir. 2015) .......... 13

*Glossip v. Gross*,
576 U.S. 863 (2015) .......... 2

*Incumaa v. Stirling*,
791 F.3d 517 (4th Cir. 2015) .......... 7

*Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*,
2012 WL 6738517 (S.D. Ind. Dec. 31, 2012) .......... 11

*Jones 'El v. Berge*,
164 F. Supp. 2d 1096 (W.D. Wis. 2001) .......... 11

*Madrid v. Gomez*,
889 F. Supp. 1146 (N.D. Cal. 1995) .......... 11

*In re Medley*,
134 U.S. 160 (1890) .......... 3

*Williams v. Sec'y Pa. Dep't of Corr.*,
117 F.4th 503 (3d Cir. 2024) .......... 11, 17

*Williams v. Sec'y Pa. Dep't of Corr.*,
848 F.3d 549 (3d Cir. 2017) .......... 7

**Statutes and Rules**

Fed. R. App. P. 29(a)(4)(E) .......... 2

**Scholarly Authorities**

Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement is Cruel and Far Too Usual Punishment*, 90 Ind. L.J. 741 (2015) .......... 5

Jamie Fellner, *A Corrections Quandary: Mental Illness and Prison Rules*, 41 Harv. C.R.-C.L. L. Rev. 391 (2006) .......... 12

Stuart Grassian & Terry A. Kupers, *The Colorado Study vs. The Reality of Supermax Confinement*, 13 Corr. Mental Health Rep. 1 (2011) .......... 9, 10

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006) .......... 5, 8, 10

Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry 1450 (1983) .......... 8

Thomas L. Hafemeister & Jeff George, *The Ninth Circle of Hell: An Eighth Amendment Analysis of Imposing Prolonged Supermax Solitary Confinement on Inmates with a Mental Illness*, 90 Denv. U. L. Rev. 1 (2012) .......... 6, 10, 14

Craig W. Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124 (2003) .......... 6, 8

Craig W. Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 Crime & Just. 365 (2018) .......... 5, 7, 8, 10

Craig W. Haney, *Restricting the Use of Solitary Confinement*, 1 Ann. Rev. Criminology 285 (2018) .......... 5

Craig W. Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 Nw. U. L. Rev. 211 (2020) .......... 9

Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442 (2014) .................... 9

Terry A. Kupers et al., *Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs*, 36 Crim. Just. & Behav., 1037 (2009) ................................ 17

Terry A. Kupers, *Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake? in* The Routledge Handbook for Int'l Crime & Just. Studies 213 (Bruce A. Arrigo & Heather Y. Bersot eds., 2014) .......................................................................... 6, 12, 15, 17

Terry A. Kupers, *What To Do With the Survivors? Coping With the Long-Term Effects of Isolated Confinement*, 35 Crim. Just. & Behav. 1005 (2008) ....................................................... 15

Ryan M. Labrecque & Paula Smith, *Assessing the Impact of Time Spent in Restrictive Housing Confinement on Subsequent Measures of Institutional Adjustment Among Men in Prison*, 46 Crim. Just. & Behav. 1445 (2019) ......................... 16

Jonathan W. Lucas & Matthew A. Jones, *An Analysis of the Deterrent Effects of Disciplinary Segregation on Institutional Rule Violation Rates*, 30 Crim. Just. Pol'y Rev. 765 (2019) ................................................................................ 15

Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry & L. 104 (2010) ....................... 7, 12

Robert G. Morris, *Exploring the Effect of Exposure to Short-Term Solitary Confinement Among Violent Prison Inmates*, 32 J. Quantitative Criminology 1 (2016) ............................ 15

Maureen L. O'Keefe et al., *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation* (2010) ................ 9

Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441 (2006) ........ 8

**Other Authorities**

Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (Dec. 2012) ........ 18

Am. Pub. Health Ass'n, *Solitary Confinement as a Public Health Issue*, Policy No. 201310 (Nov. 2013) ........ 18

G.A. Res. 70/175, r. 45(2) (Dec. 17, 2015) ........ 18

Nat'l Comm'n on Corr. Health Care, *Position Statement: Solitary Confinement* (Apr. 2016) ........ 18

*Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences: Hearing Before the Subcomm. on the Constitution, Civil Rights, & Human Rights of the S. Comm. on the Judiciary*, 112th Cong. 72 (2012) ........ 5, 8

U.S. Dep't of Justice, *Report and Recommendations Concerning the Use of Restrictive Housing* (Jan. 2016) ........ 4

## INTEREST OF AMICI CURIAE

Amici curiae are experts in psychiatry and psychology who have spent decades studying solitary confinement and its effects on prisoners. Their research has consistently shown that solitary confinement has devastating, often irreversible effects on prisoners' mental and physical health. It does so by depriving prisoners of two basic human needs: social contact and adequate positive environmental stimulation. The harms resulting from these deprivations are different in kind—and far more severe—than the harms imposed by imprisonment itself. And when a prisoner suffers from mental illness, the harms of solitary confinement are further exacerbated. Indeed, solitary confinement frequently sets in motion a self-perpetuating cycle of psychiatric deterioration, rule violations, and additional isolation.

The damage wrought by solitary confinement has long been recognized by experts and society at large. Amici submit this brief to present the Court with the scientific consensus regarding the effects of solitary confinement on prisoners with serious mental illness and its efficacy as a disciplinary tool—matters directly at issue in this appeal.

Amicus Stuart Grassian, M.D. is a psychiatrist who taught at Harvard Medical School for almost thirty years. He has evaluated hundreds of prisoners in solitary confinement and published numerous articles on the psychiatric effects of solitary confinement. Members of the Supreme Court have cited his work in *Glossip v. Gross*, 576 U.S. 863, 926 (2015) (Breyer, J., dissenting); *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring); and *Apodaca v. Raemisch*, 586 U.S. 931, 935 n.8 (2018) (Sotomayor, J., respecting denial of certiorari).

Amicus Craig Haney, Ph.D., J.D. is a Distinguished Professor of Psychology and served as UC Presidential Chair at the University of California, Santa Cruz. He has researched and published numerous articles on the psychological effects of solitary confinement and has provided expert testimony before numerous courts and the United States Senate. Members of the Supreme Court have cited his work in *Glossip*, 576 U.S. at 926 (Breyer, J., dissenting) and *Brown v. Plata*, 563 U.S. 493, 518 & n.5 (2011).

No counsel for any party authored this brief in whole or in part, and no person or entity aside from amici and their counsel funded its preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

# ARGUMENT

## I. Solitary confinement is uniquely harmful to prisoners with serious mental illness and causes a cycle of punishment.

More than 130 years ago, the Supreme Court remarked on the "objectionable features" of solitary confinement. *In re Medley*, 134 U.S. 160, 167 (1890). Citing an "exhaustive article on th[e] subject," the Court observed that prisoners subjected to solitary confinement "fell … into a semi-fatuous condition," "became violently insane" or "committed suicide," and that solitary confinement had long been "found to be too severe." *Id.* at 168. Since then, even more exhaustive research has confirmed the point. Today's psychological, psychiatric, and medical consensus is that solitary confinement inflicts an "immense amount of torture and agony" on prisoners. *Apodaca*, 586 U.S. at 937 (2018).

Anthony Gay discovered that firsthand. Mr. Gay was imprisoned by the Illinois Department of Corrections from 1994 until 2018. Over the course of his incarceration, he was diagnosed with a variety of mental disorders, including borderline personality disorder, impulse control disorder, mood disorder not otherwise specified, depressive disorder, post-traumatic stress disorder, bipolar disorder, and unspecified anxiety disorder. R.304 at 92. In 1996, Mr. Gay was placed in segregation to

discipline him for participating in a fight. While in segregation, he engaged in maladaptive behaviors for years, including horrifying acts of self-mutilation. R.304 at 92–93. His conduct resulted only in more discipline, causing a longer and longer stay in segregation—all driven by an inexorable link between his behavior and his mental illness. When Mr. Gay was removed from segregation after more than 20 years, his condition improved substantially. R.304 at 99.

Although correctional systems use several labels for solitary confinement (including "segregation," "restrictive housing," "administrative detention," "disciplinary segregation," and "supermax"), it is characterized by the severe restriction of meaningful social interaction and positive environmental stimulation in which a person is typically confined alone in a cell for upwards of twenty-two or more hours per day. *See* U.S. Dep't of Justice, *Report and Recommendations Concerning the Use of Restrictive Housing* 3 (Jan. 2016). Whatever the label, Mr. Gay's tragic experience shows why solitary confinement should never be used as a punishment for prisoners with serious mental illness. Punishing mentally-ill prisoners in this manner inflicts immense psychiatric and physical harm and pushes them further towards maladaptive behavior.

### A. Solitary confinement deprives prisoners of necessary social interaction and environmental stimulation.

The human brain "is literally wired to connect to others." Craig Haney, *Restricting the Use of Solitary Confinement*, 1 Ann. Rev. Criminology 285, 296 (2018). Basic executive function and physical health depend on adequate exposure to positive environmental stimuli, which allows humans to maintain "an adequate state of alertness and attention." Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 330 (2006); Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 Crime & Just. 365, 374–75 (2018). Solitary confinement deprives prisoners of these necessities.

Prisoners in solitary confinement typically spend twenty-two hours or more every day alone in small, bare cells, containing only a bunk, toilet, and sink. Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement is Cruel and Far Too Usual Punishment*, 90 Ind. L.J. 741, 753 (2015). Inside such small cells, prisoners "sleep, eat, and defecate … in spaces that are no more than a few feet apart." *Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences: Hearing Before the Subcomm. on the Constitution, Civil Rights, & Human Rights of the S. Comm. on the Judiciary*, 112th Cong.

72, 75 (2012) (prepared statement of Dr. Craig Haney, Professor of Psychology, University of California, Santa Cruz).

Prisoners in solitary confinement also are denied meaningful human communication. They hear only slamming cell doors and screaming from other prisoners. Terry A. Kupers, *Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?*, in The Routledge Handbook for Int'l Crime & Just. Studies 213, 215–16 (Bruce A. Arrigo & Heather Y. Bersot eds., 2014). The noises compound the other negative stimuli surrounding the prisoner: the stench of feces and urine, and the glare of fluorescent lights. Thomas L. Hafemeister & Jeff George, *The Ninth Circle of Hell: An Eighth Amendment Analysis of Imposing Prolonged Supermax Solitary Confinement on Inmates with a Mental Illness*, 90 Denv. U. L. Rev. 1, 37–39, 39 n.217 (2012).

Although prisoners may leave their cells for short periods of time, there is typically little relief from the austere conditions. They may exercise, but often only in their cell or "in caged-in or cement-walled areas that are so constraining they are often referred to as 'dog runs.'" Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 126 (2003). And in order to exercise,

prisoners are often subjected to painful and invasive strip and cavity searches. *See, e.g.*, *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 554 (3d Cir. 2017) (describing strip searches so invasive that a prisoner sacrificed the opportunity to exercise for nearly seven years to avoid them), *cert. denied sub nom. Williams v. Wetzel*, 583 U.S. 932 (2017); *Incumaa v. Stirling*, 791 F.3d 517, 531 (4th Cir. 2015) (noting that a prisoner in solitary confinement experienced "near-daily cavity and strip searches").

### B. The psychological and physical harm from solitary confinement is well established.

The scientific consensus on the severe harm caused by solitary confinement is overwhelming. Prisoners in solitary confinement endure a condition that "can be as clinically distressing as physical torture," *see* Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry & L. 104, 104 (2010), and is, in fact, "frequently used as a component of torture," Haney, *The Psychological Effects of Solitary Confinement*, *supra*, at 373–75. Solitary confinement imposes grave psychological and physical harms, especially when the confinement is prolonged (as it was here). *See id.* at 367–68, 370–75 (collecting studies); Grassian, *Psychiatric Effects*, *supra*, at 335–38.

Psychological injuries stemming from solitary confinement include cognitive dysfunction, severe depression, memory loss, anxiety, paranoia, panic, hallucinations, and hypersensitivity to stimuli. *See* Haney, *Mental Health Issues*, *supra*, at 130–31, 134–35 (collecting studies); Grassian, *Psychiatric Effects*, *supra*, at 335–36, 349, 370–71; Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441, 488–90 (2006).

Self-mutilation and suicidal ideation are also characteristic of prisoners in solitary confinement. *See* Grassian, *Psychiatric Effects*, *supra*, at 336, 349; Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry 1450, 1453 (1983). Explaining this phenomenon to Congress, Dr. Haney described how one prisoner "used a makeshift needle and thread from his pillowcase to sew his mouth completely shut," and another "amputated one of his pinkie fingers and chewed off the other, removed one of his testicles and scrotum, sliced off his ear lobes, and severed his Achilles tendon." *Reassessing Solitary Confinement*, *supra*, at 80–81.

Indeed, rates of self-harm and suicide are dramatically higher among prisoners in solitary confinement than among the general prison

population. Grassian & Kupers, *The Colorado Study vs. The Reality of Supermax Confinement*, 13 Corr. Mental Health Rep. 1, 9 (2011); *see also* Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442, 445–47 (2014) (finding that inmates in solitary confinement were approximately 6.9 times as likely to commit acts of self-harm). The isolation and exclusion caused by solitary confinement likewise leads to depression, anxiety, emotional numbness, and lethargy. Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 Nw. U. L. Rev. 211, 233 (2020). Solitary confinement also deprives individuals of the social contact needed to anchor them to socially appropriate thoughts and behaviors, and oftentimes leads to violence and aggression. *Id.*

Despite overwhelming evidence of the harms of solitary confinement, prison officials sometimes point to an outlier article or two they suggest condone its use. *See, e.g.*, Maureen L. O'Keefe et al., *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation* (2010). But those studies employed fatally flawed methodology, including cross-contamination, use of self-reporting scales without any attempt at external validation, and omission of raw data. *See* Grassian &

Kupers, *supra*, at 11; Haney, *The Psychological Effects of Solitary Confinement*, *supra*, at 385–98.

### C. Individuals with pre-existing mental illness suffer even greater harm from solitary confinement.

**1.** Prisoners with mental illnesses suffer even more extreme harm from solitary confinement. Solitary confinement can "severe[ly] exacerbat[e]" underlying conditions, and without social interaction to ground them in reality, many prisoners "experience catastrophic and often irreversible psychiatric deterioration." Hafemeister & George, *supra*, at 39. "[T]he presence of a preexisting personality disorder or impairment of psychosocial functioning [is] associated with increased risk of incapacitating fearfulness, paranoia, agitation, and irrational aggression toward staff." Grassian, *Psychiatric Effects*, *supra*, at 348. And at worst, prisoners can experience "psychotic symptoms and/or significant functional impairments" and "extreme acts of self-mutilation and even suicide." Hafemeister & George, *supra*, at 39.

Courts have long recognized these unique harms. The Northern District of California has observed that, for prisoners who are "already mentally ill, as well as persons with … a history of prior psychiatric problems or chronic depression[,] … placing them in [solitary

confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe." *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995). In short, placing mentally-ill prisoners in solitary deprives them "of a minimum civilized level of one of life's necessities." *Id.* at 1266.

Courts in this circuit have likewise noted that solitary confinement can cause "relatively healthy prisoners who have histories of serious mental illness" to suffer "paranoid delusional disorder, dissociative disorder, schizophrenia and panic disorder." *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1101–02 (W.D. Wis. 2001); *see also Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, 2012 WL 6738517, at *15 (S.D. Ind. Dec. 31, 2012) (concluding that segregation "exacerbate[s] the prisoners' symptoms of serious mental illness").

And the Third Circuit, relying in part on a U.S. Department of Justice investigation finding that placing prisoners with serious mental illness in solitary confinement "exposes them to an excessive and obvious risk of serious harm," recently reversed summary judgment on ADA and Eighth Amendment claims. *Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 529, 537 (3d Cir. 2024) (finding that the Pennsylvania Department

of Corrections "had an obligation to modify its practices to ameliorate the harms of prolonged solitary confinement" on a mentally-ill prisoner).

**2.** The increased vulnerability of mentally-ill prisoners in solitary confinement risks creating a dangerous cycle. Prisoners with mental illness are frequently less able to conform their behavior to prison rules. *See* Jamie Fellner, *A Corrections Quandary: Mental Illness and Prison Rules*, 41 Harv. C.R.-C.L. L. Rev. 391, 396–99 (2006). Their mental illness may thus cause them to have higher rates of discipline than other prisoners receive. And if lesser punishments don't deter the rule-breaking, officials often isolate mentally-ill prisoners in segregation. *See* Metzner & Fellner, *supra*, at 104. But because solitary confinement worsens the symptoms of their mental illness, prisoners are often left even less able to conform their behavior to prison rules than they were to begin with. *Id.*

Tragically, prisoners subjected to long periods of solitary confinement become more maladjusted and may be incapable of constructive social interactions. *See* Kupers, *Isolated Confinement*, *supra*, at 218 (solitary confinement leads to "damaged prisoners who become chronically dysfunctional"). In this way, mentally-ill prisoners often end up in a cycle

of infractions and additional segregation time, leaving them in solitary confinement indefinitely, at great cost to their wellbeing. This is what happened to Mr. Gay, causing two decades of physical and psychological harm.

## II. Accommodating mentally-ill prisoners by employing non-solitary alternatives furthers prison goals.

This Court and the Supreme Court have recognized "maintaining institutional security and preserving internal order and discipline" as the values underpinning prison punishment. *See Gevas v. McLaughlin*, 798 F.3d 475, 484 (7th Cir. 2015) (quoting *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)). Yet because mentally-ill prisoners often cannot conform their behavior to prison rules, punishment frequently has little specific-deterrent effect. And because solitary confinement makes prisoners' mental illness worse, its use undermines security and order in prison. For these reasons, responding to the rule violations of mentally-ill prisoners through disciplinary measures other than solitary confinement advances, rather than impedes, the goals of institutional security and order.

### A. For mentally-ill prisoners, solitary confinement can do more harm than good.

Mentally-ill prisoners are more likely to end up in solitary confinement because they frequently cannot control their behaviors to comply with certain prison rules. *See* Hafemeister & George, *supra*, at 37–39, 49–50. Indeed, prisoners "with a mental illness are generally more likely to accumulate disciplinary infractions than counterparts who do not have a mental illness." *Id.* at 50 (citing multiple studies). It is, sadly, unsurprising then that a study of 200 inmates in supermax facilities in New York found that the average stay for mentally-ill prisoners was six-and-a-half times longer than for all other inmates. *Id.*

But when a prisoner's mental illness prevents them from conforming their behavior to prison rules—or acting rationally at all—punishing them will have little value as a specific deterrent. "[T]here is little penological purpose being served by such a system when its infraction system is based on the rationality of the inmate but is applied to an irrational inmate." *Id.* And it makes even less sense when the punishment makes prisoners *less* capable of conforming their behavior to prison rules.

In addition to worsening psychiatric symptoms, solitary confinement also causes "[r]elationships between staff and prisoners [to] break

down." Kupers, *Isolated Confinement*, *supra*, at 216. Prisoners in solitary confinement are subjected to "isolation and idleness" and are deprived of "social contact and all means to express themselves in a constructive manner." *Id.* As a result, they often resort to "desperate acts to achieve some degree of control of their situation," which officers often interpret as disrespectful or rule-breaking. *Id.*

In short, "isolation itself causes anger to mount" leading to "a vicious cycle—the prisoner becoming more angry and incapable of controlling his temper and the resulting disciplinary tickets leading to more time in the isolation setting that induces the angry behaviors." Kupers, *What To Do With the Survivors? Coping With the Long-Term Effects of Isolated Confinement*, 35 Crim. Just. & Behav. 1005, 1012 (2008).

Research confirms this. In a study of almost 4,000 prisoners who were housed in solitary confinement as a punishment for infractions, researchers found no decrease in the likelihood or timing of subsequent violence and other maladaptive behavior. Robert G. Morris, *Exploring the Effect of Exposure to Short-Term Solitary Confinement Among Violent Prison Inmates*, 32 J. Quantitative Criminology 1 (2016). Other studies have found the same. *See, e.g.*, Jonathan W. Lucas & Matthew A. Jones,

*An Analysis of the Deterrent Effects of Disciplinary Segregation on Institutional Rule Violation Rates*, 30 Crim. Just. Pol'y Rev. 765 (2019); Ryan M. Labrecque & Paula Smith, *Assessing the Impact of Time Spent in Restrictive Housing Confinement on Subsequent Measures of Institutional Adjustment Among Men in Prison*, 46 Crim. Just. & Behav. 1445 (2019).

Because solitary confinement often exacerbates the very conditions that cause prisoners to commit infractions, and punishes prisoners who are not capable of conforming their behavior to prison rules, it is not an effective punishment. It fails to make prisons safer, more secure, or more orderly; frequently, it does the exact opposite.

### B. Prisons more effectively deter bad behavior and reduce violence when they reduce or eliminate solitary confinement.

While there's no serious dispute that solitary confinement harms prisoners and creates dysfunction, research has shown that the inverse is also true. When prisons reduce or eliminate the use of solitary confinement, they achieve better outcomes: less violence and a safer and more orderly environment.

A natural experiment in Mississippi prisons proves the point. Under federal consent decrees, the Mississippi Department of Corrections

removed prisoners with serious mental illness from administrative segregation and significantly reduced the overall population of prisoners in segregation. Terry A. Kupers et al., *Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs*, 36 Crim. Just. & Behav. 1037 (2009); *see also* Kupers, *Isolated Confinement*, *supra*, at 229–30. The result? "[T]he violence rate in the entire DOC decreased significantly." *Id.* at 230. Prisoners suffering from mental illness who were transferred out of segregation "received far fewer disciplinary infractions after they were transferred out of the super max unit" and there was a "large reduction in the rates of misconduct and violence" among both the prisoners transferred out of solitary confinement and the prison population at large. *Id.*

Pennsylvania prisons have seen similar results. After a DOJ investigation, the Pennsylvania Department of Corrections reduced its use of solitary confinement. *See Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 531–56 (3d Cir. 2024) (attaching DOJ report on findings). DOJ expert-consultants found dramatic improvements in the mental health of

those removed from solitary confinement, and prison staff reported "a marked reduction in negative behaviors by prisoners." *Id*. at 536.

A widespread professional consensus is founded on evidence. The American Psychiatric Association opposes the prolonged segregation of prisoners with serious mental illness. Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (Dec. 2012). The National Commission on Correctional Health Care recommends that mentally-ill individuals be excluded from solitary confinement altogether. Nat'l Comm'n on Corr. Health Care, *Position Statement: Solitary Confinement* at 4 (Apr. 2016). The American Public Health Association has urged correctional systems to "develop alternative disciplinary sanctions and processes that accommodate prisoners with serious mental illnesses." Am. Pub. Health Ass'n, *Solitary Confinement as a Public Health Issue*, Policy No. 201310 at 7 (Nov. 2013). And the United Nations Standard Minimum Rules for the Treatment of Prisoners prohibit solitary confinement of prisoners "with mental or physical disabilities when their conditions would be exacerbated by such measures." G.A. Res. 70/175, r. 45(2) (Dec. 17, 2015).

These results are not surprising. Mentally-ill prisoners often cannot reliably comply with prison rules, and the devastating effects of solitary confinement on an already vulnerable population only make that problem worse. Because solitary confinement leads to anger, psychotic symptoms, and increased disorder, prisons are more secure when the use of solitary confinement is reduced.

## CONCLUSION

There is a widespread scientific consensus that solitary confinement inflicts devastating psychological and physical harm. The effects are worse for mentally-ill prisoners, who often cannot conform their behavior to prison rules. Its use of solitary confinement for these prisoners is especially senseless and cruel. This Court should heed these facts and reverse the district court's judgment.

November 12, 2026

*<u>/s/ Timothy E. Cunningham, Jr.</u>*

Peter A. Bruland
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington D.C. 20005
(202) 736-8000
pbruland@sidley.com

Leslie Kuhn-Thayer
Harry Dodsworth
Timothy E. Cunningham, Jr.
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
lkuhntha@sidley.com
hdodsworth@sidley.com
tim.cunningham@sidley.com

*Counsel for Amici Curiae Stuart Grassian, M.D. and Craig W. Haney, Ph.D., J.D.*

## CERTIFICATE OF SERVICE

I certify that on November 12, 2026, I electronically filed this brief with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Timothy E. Cunningham, Jr.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

This brief complies with the type-volume limitations of Circuit Rule 29 because it contains 3,502 words, not counting parts excluded by Federal Rule of Appellate Procedure 32(f).

*/s/ Timothy E. Cunningham, Jr.*